THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, Petitioner-Appellant, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

Fourth District   No. 4—04—0359

Argued January 12, 2005.—Opinion filed September 26, 2005.

MYERSCOUGH, J., specially concurring in part and dissenting in part.

Michael R. Cornyn (argued), of Thomas, Mamer & Haughey, L.L.P., of Champaign, for petitioner.

Stanley Eisenstein (argued), of Katz, Friedman, Eagle, Eisenstein & Johnson, P.C., of Chicago, for respondent Service Employees International Union Local 73/Chapter 119.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and John P. Schmidt (argued), Assistant Attorney General, of counsel), for respondent Educational Labor Relations Board.

JUSTICE KNECHT delivered the opinion of the court:

The Board of Trustees of the University of Illinois, Urbana-Champaign campus (University), appeals the March 2004 order of the Illinois Educational Labor Relations Board (Board) that found the University committed unfair labor practices by failing to bargain with Service Employees International Union, Local 73/Chapter 119 (Union), over the issue of parking fees. *In re Board of Trustees of the University of Illinois*, 20 Pub. Employee Rep. (Ill.) par. 40, Nos. 2001—0044—S, 2003—CA—0005—S (Illinois Educational Labor Relations Board, March 22, 2004). On appeal, the University argues bargaining over parking fees was not mandatory as (1) parking fees do not concern a term and condition of employment and (2) the burden that bargaining imposes on the University's authority far outweighs any benefit to the Union's workers. We reverse.

## I. BACKGROUND

The Union is the exclusive bargaining agent for two bargaining units, the building service workers, maids, and linen maids (Building Service Workers) and the Food Service Workers, with approximately 600 members and 150 members, respectively.

In June 2001, the Union filed a charge of unfair labor practices against the University with the Board. The charge, on behalf of the Building Service Workers, alleged on or since May 2001, the University improperly refused to bargain over parking fees and increases and unilaterally increased parking fees for the Building Service Workers. In August 2002, the Union filed a similar charge on behalf of the Food Service Workers.

In January and August 2002, the Board's Executive Director issued complaints and notices of hearing with respect to these charges. In October 2002, the Board consolidated the cases. The University responded and argued the issue of parking fees was not subject to mandatory bargaining.

In November 2002, a hearing was held in the cases. At the hearing, the testimony and exhibits established the following.

The University is located in Urbana and Champaign and is surrounded by residential and commercial areas. Its mission includes research, public service, and economic development. Approximately 14,000 employees and 38,000 students are on campus. Approximately 90% of the Union employees drive to work.

The University maintains over 100 surface parking lots, as well as

4 multilevel parking structures. To use the parking facilities, employees and students purchase hang tags. To park at most of the lots, first-shift employees pay a yearly fee of $345. Second- and third-shift employees pay an annual $75 fee. Students, who pay by the semester, pay a slightly higher fee. The cheapest of these lots, which costs $80 per year, offers a free shuttle bus to the campus. The University also provides metered parking spaces that may be rented for $650.

Parking-related decisions are closely tied to the master plan for the campus. A University official explained the relationship:

"[A]t Urbana-Champaign, for example, after [the] [m]aster [p]lan was approved by the Board of Trustees and for some time—20, 30 years—we have used the parking as a means to purchase land as it became available within the boundaries of our [m]aster [p]lan.

When it was first laid out, we did not own all of the real estate within that [m]aster [p]lan. So as houses or apartments, businesses became available for sale within that [m]aster [p]lan, we purchased those where we could[,] using parking revenue. Then we used those areas as surface lots until such time as we needed those to build out the academic facilities of the University.

We knew when we did that, that those facilities—in other words, to continue to have parking close to the University, we would replace those surface lots with academic buildings and we would have to build parking structures in order to keep the same amount of parking close in."

The University does not receive state funding for its parking facilities. To finance new parking, long-term revenue bonds are issued. To issue these bonds, the University must project the revenue from the parking facilities and demonstrate the revenue will cover the debt service on those bonds. The need to increase fees for parking is often linked to the need to construct parking facilities.

Other parking alternatives exist near the University. These include on-street parking at metered spaces and lots maintained by Champaign and Urbana, as well as private parking. Moreover, the mass transit district provides free bus service to employees. This service is provided due to a contract between the University and the mass transit district, at a cost of over $500,000 per year to the University. Parking fees pay for this service.

Testimony reveals the parking alternatives had limits. Urbana prohibits parking in residential areas near the University before 10 a.m. Half of the Union employees work before that time. Most of the Building Service Workers who work at the Illinois Union cannot find free street parking, although the night-shift workers usually can. In addition, parking at the city-operated facilities near campus is difficult

to find at times. The odds of finding an open metered space are "slim to none." Second-shift employees have difficulty finding metered street parking because their shifts often overlap with the day-shift employees. Third-shift employees may not use street parking because the campus bans parking between 2 and 6 a.m. Moreover, bus service is unavailable for employees who begin work at 5 or 6 a.m.

During negotiations for a new collective-bargaining agreement, the Union proposed new parking rates for its members. The Union proposed an annual rate of $50 for most facilities, with a fee of $25 for second- and third-shift employees. The proposal also provided for free parking between 2 and 6 a.m., and a $10-per-year fee for the shuttle lot. The University refused to bargain over the issue. A Union official testified he believed the Union could submit bargaining proposals that take into consideration the University's need to assure a certain amount of revenue for parking fees. That same official believed this could be accomplished by a fee-structure based on an employee's salary. The average yearly salary for a food service worker who works overtime is $20,000.

In September 2003, the administrative law judge (ALJ) determined parking was a subject of mandatory bargaining and the University committed an unfair labor practice under sections 14(a)(5) and (a)(1) by not bargaining with the Union over parking fees. *In re Service Employees International Union, Local 73/Chapter 119*, 19 Pub. Employee Rep. (Ill.) par. 150, Nos. 2001—CA—0044—S, 2003—CA—0005—S (Illinois Educational Labor Relations Board, ALJ's Recommended Decision and Order, September 5, 2003). In March 2004, the Board agreed. In doing so, however, the Board agreed the issue concerned a "term and condition" of employment but disagreed with the ALJ's finding that parking and parking fees are not a matter of "inherent managerial authority." The Board then proceeded to a balancing test and found the benefits outweighed the burden of bargaining and so concluded this was a mandatory subject of bargaining. This appeal followed.

## II. ANALYSIS

■ An educational employer commits an unfair labor practice when it refuses "to bargain collectively in good faith with an employee representative" (115 ILCS 5/14(a)(5) (West 2000)) or restrains or interferes with employees in exercising their rights under the Illinois Educational Labor Relations Act (Act) (115 ILCS 5/14(a)(1) (West 2000)). In the context of this case, in which the Board decided the University committed an unfair labor practice, section 4 of the Act is relevant. Under section 4, educational employers are not "required to

bargain over matters of inherent managerial policy," but must "bargain collectively with regard to policy matters directly affecting *** terms and conditions of employment." 115 ILCS 5/4 (West 2000).

■ The Supreme Court of Illinois has set forth a test to determine when, under section 4, bargaining is "mandatory." First, a determination must be made whether the matter concerns "terms and conditions of employment" (115 ILCS 5/4 (West 2000)). If it does not, the inquiry is over and the employer need not bargain. If, however, the answer is yes, a second question follows: whether the matter is one of "inherent managerial authority" (115 ILCS 5/4 (West 2000)). If the answer is no, bargaining the matter is mandatory. If the answer is yes, the inquiry continues. The third step is to "balance the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority." *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 523, 599 N.E.2d 892, 905 (1992).

■ The parties agree our review of the issue is limited to whether the Board's decision is clearly erroneous. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998). This is due to the absence of dispute over the facts and the applicable law and to the fact the issue for our review is whether the undisputed facts satisfy the statutory standard. See *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391, 763 N.E.2d 272, 279 (2001). Under the clearly-erroneous standard of review, we will affirm the Board's decision unless, after considering the record, we are left with the definite and firm conviction the agency was mistaken. *AFM Messenger Service*, 198 Ill. 2d at 395, 763 N.E.2d at 282.

### A. Term and Condition of Employment

■ The parties dispute that parking fees concern a "term and condition of employment." A term and condition of employment is "something provided by an employer which intimately and directly affects the work and welfare of the employees." *Vienna School District No. 55 v. Illinois Educational Labor Relations Board*, 162 Ill. App. 3d 503, 507, 515 N.E.2d 476, 479 (1987). In an earlier case regarding parking at Southern Illinois University at Edwardsville, the Board concluded parking fees concerned terms and conditions of employment. See *In re Southern Illinois University Edwardsville Professional Staff Ass'n*, 15 Pub. Employee Rep. (Ill.) par. 1063, Nos. 97—CA—0016—S, 97—CA—0017—S (IELRB September 22, 1998) (hereinafter *SIU-E*, 15 Pub. Employee Rep. (Ill.) par. 1063). Other labor relations boards have similarly concluded parking fees are terms and conditions

of employment whether the cases involved an increase in existing fees (*Statewide University Police Ass'n v. Regents of the University of California*, 7 Pub. Employee Rep. (Cal.) par. 14288, Nos. S—CF—6—H, LA—CF—47—H (CPERB November 14, 1983)) or the imposition of new fees when parking had been free (*Fraternal Order of Police v. City of Jacksonville*, 21 Pub. Employee Rep. (Fla.) par. 26178, No. CA—95—010 (FPERC June 1, 1995)). Moreover, the National Labor Relations Board found moving a parking lot, which would increase commute time by 20 minutes each way, affected a term and condition of employment. See *In re United Parcel Service*, 336 NLRB 1134, 1135 (2001).

The University tries to prove parking fees are not terms and conditions of employment by distinguishing the *SIU-E* decision and pointing to the alternatives to fee parking available to its employees. We agree the facts of *SIU-E* are distinguishable. For example, the Edwardsville campus is located outside town in a wooded area, making driving the "most reasonable method of getting to work" for most employees. In addition, the Edwardsville campus offered parking in only one of its 33 lots, and the least-expensive parking alternative was not available to employees. See *SIU-E*, 15 Pub. Employee Rep. (Ill.) par. 1063. Simply because the circumstances of the two cases are not the same does not mean the Board's decision is clearly erroneous. The circumstances of this case may support a finding the parking fees concerned a term and condition of employment.

■ We find the University's argument that alternative parking is available to its employees and thus an increase in parking fees does not involve a term and condition of employment unconvincing. First, the University has failed to cite any support for the proposition that existing alternatives to fee parking on campus alone render the parking-fee increase not one affecting a term and condition of the Union workers' employment. As the California Public Employment Relations Board (California Board) found, this argument would fail. In *Statewide University Police Ass'n*, 7 Pub. Employee Rep. (Cal.) par. 14288, the California Board rejected a similar argument by relying, in part, on the United States Supreme Court decision in *Ford Motor Co. v. National Labor Relations Board*, 441 U.S. 488, 60 L. Ed. 2d 420, 99 S. Ct. 1842 (1979). The California Board observed that the Court, in finding in-house food-service costs were terms and conditions of employment, approvingly cited decisions "in which the 'captive consumer—no reasonable alternative' situation did not exist." *Statewide University Police Ass'n*, 7 Pub. Employee Rep. (Cal.) par. 14288, citing *Ford Motor Co.*, 441 U.S. at 493 n.6, 60 L. Ed. 2d at 425 n.6, 99 S. Ct. at 1847 n.6. Second, as the Board properly observed, the

University's so-called alternatives were not feasible choices for many of the Union employees.

The University provided parking for its employees. The parking benefitted not only the employees, but also the University. Approximately 90% of the University employees drive to work, and parking on the University lots and structures is, it appears, often the most feasible alternative for these employees. Given the facts of this case, the Board's decision that parking fees intimately and directly affect the employees' work and welfare is not clearly erroneous.

## B. Balancing Test

■ Because neither party challenges the Board's decision that the increase in parking fees is a matter of "inherent managerial authority," we review the Board's application of the third part of the *Central City* test. The third part of the test requires balancing the benefits of bargaining with the resulting burdens on the employer's authority. This is a fact-specific undertaking, for which the Board is "eminently qualified." *Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905.

The University argues the Board reached the wrong decision. The University contends the Board's balancing appears in one sentence—a sentence, it argues, that relies solely on testimony from the Union:

> "In this case, there was testimony by the Union that [it] believe[s] [it] could make proposals about bargain[ing] parking and parking fees that would satisfy the [e]mployer, such as bargaining parking fees based on an employee's yearly salary."

The University maintains the resulting burdens on its authority far outweigh any benefit, which it claims will be none, to Union workers. The University points to testimony showing the decisions regarding parking are "integral to long-range planning on campus" and "essential to the mission of the University." The University concludes bargaining this issue will interfere "seriously" with the planning and financing of campus facilities.

The record, as a whole, demonstrates the Board considered the same facts and performed the same balancing the University asks us to consider and do here. First, the sentence preceding the one emphasized by the University demonstrates the Board was aware of the University's financial concerns: "We must consider whether the Union would be able to offer proposals that might address the [e]mployee's financial concerns and whether the matter is amenable to bargaining." Second, the Board's decision expressly adopts the ALJ's findings. These adopted findings discuss the University's mission, the financing of parking structures, and the role parking and parking fees play in the master plan for the campus.

Having determined the Board balanced the benefits and burdens,

we must decide whether its ultimate decision is clearly erroneous. We hold it is. On one side of the scale is the University's master plan and the parking component of that plan. On the other side are the employees, whose livelihood and workplace are directly affected by the costs of parking, so they may work at and for the benefit of themselves and the University.

We conclude the evidence shows parking and the use of parking lots for land planning are integral to the success of the University's mission. Locations and proximity of parking lots, the cost of parking, and the potential long-term use of land acquired for parking are part of the University's managerial authority. The need for the University to control these issues cannot be overcome by vague fee proposals that the Union believes would satisfy the employer.

The Board engaged in balancing, but we find its decision is clearly erroneous. Better, cheaper parking would be a benefit to employees. However, mandatory bargaining of this issue would be a significant burden on the University and the authority of the University to perform its mission.

## III. CONCLUSION

For the reasons stated, we reverse the Board's decision.

Reversed.

TURNER, J., concurs.

JUSTICE MYERSCOUGH, specially concurring in part and dissenting in part:

I respectfully specially concur in part and dissent in part.

I agree parking fees concern a "term and condition of employment." I further conclude parking fees are *not* a matter of "inherent managerial authority." See *Board of Trustees of the University of Illinois v. Labor Relations Board State Panel*, No. 4—04—0484, slip op. at 21 (September 26, 2005), (Myerscough, J., dissenting). However, the Union did not appeal the Board's decision that parking fees were a matter of inherent managerial authority, so that issue is not before this court.

I disagree with the majority that the Board's decision balancing the benefits to the burdens was clearly erroneous. As the majority notes, this balancing "is a fact-specific undertaking, for which the Board is 'eminently qualified.' " 359 Ill. App. 3d 1123, quoting *Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905. As also noted in the majority, "[u]nder the clearly-erroneous standard of review, we will affirm

the Board's decision unless, after considering the record, we are left with the definite and firm conviction the agency was mistaken. *AFM Messenger Service*, 198 Ill. 2d at 395, 763 N.E.2d at 282." 359 Ill. App. 3d at 1121. The Board balanced the benefits and burdens, and its decision cannot be said to be clearly erroneous simply because we disagree or prefer another outcome because of the enormity of the lack of parking at the University and its impact on the University's financial condition. This court is not the trier of fact but merely a reviewing court of limited scope. The Board should, therefore, be affirmed.

I recognize that my positions in this case and *Board of Trustees of the University of Illinois*, No. 4—04—0484, would result in different outcomes in these two cases were I the majority. However, the Illinois Educational Labor Relations Board's and Illinois Labor Relations Board's respective decisions are not binding on each other. In fact, the Board has contradicted itself in *SIU-E*, 15 Pub. Employee Rep. (Ill.) par. 1063, finding parking fees not a matter of inherent managerial authority and, to the contrary, here finding them a matter of inherent managerial authority. Nonetheless, our job is not to substitute our fact-finding for that of the Boards.

For these reasons, I would affirm the Board.