Docket Nos. 101450, 101508, 101542, 101558 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE BOARD OF TRUSTEES OF THE UNIVERSITY OF
ILLINOIS, Appellee, v. THE ILLINOIS LABOR RELATIONS
BOARD *et al*., Appellants.–THE BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS, Appellee, v. THE ILLINOIS
EDUCATIONAL LABOR RELATIONS BOARD *et al*., Appellants.

*Opinion filed January 19, 2007.*

JUSTICE KILBRIDE delivered the judgment of the court, with
opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, and Burke
concurred in the judgment and opinion.

Justice Garman dissented, with opinion, joined by Justice
Karmeier.

## OPINION

In this consolidated case, we must construe whether the unionized
public employees' proposal on parking arrangements for personal
vehicles constitutes a subject of mandatory collective bargaining under
the applicable state labor relations acts. In each case, the
administrative law judge (ALJ) and the reviewing labor relations board
applied the test in *Central City Education Ass'n v. Illinois
Educational Labor Relations Board*, 149 Ill. 2d 496 (1992), to
determine whether bargaining was mandatory and concluded that it

was mandatory. The appellate court reversed, holding that employee parking is not subject to mandatory bargaining. 359 Ill. App. 3d 1116; 361 Ill. App. 3d 256. We reverse the appellate court in each of the consolidated cases.

## I. BACKGROUND

In the case appealed by the Illinois Educational Labor Relations Board (IELRB) and the Service Employees International Union, Local 73, Chapter 119 (SEIU), the SEIU proposed a parking fee schedule that based the amount of the fee on the time of day and type of parking. The Board of Trustees of the University of Illinois at Urbana (University) refused to negotiate on the proposal and unilaterally increased the parking fees because it maintained that parking was subject only to permissive bargaining.

In June 2001, the SEIU filed an unfair labor practice charge with the IELRB. The next year, the SEIU filed a second unfair labor practices charge alleging that the University continued to refuse to bargain on the issue of parking fees. The cases were consolidated, and a full evidentiary hearing was held before an ALJ. The ALJ found that parking and parking fees constituted terms and conditions of employment and that these matters were outside the University's inherent managerial authority. *Service Employees International Union, Local 73, Chapter 119*, 19 Pub. Employee Rep. (Ill.) par. 150, Nos. 2001–CA–0044–S, 2003–CA-0005–S cons. (IELRB, ALJ's Recommended Decision and Order, September 5, 2003) (hereinafter 19 Pub. Employee Rep. (Ill.) par. 150). Thus, the ALJ determined that, pursuant to the test adopted in *Central City*, 149 Ill. 2d at 523, the University's refusal to bargain collectively on the SEIU's parking proposal was an unfair labor practice in violation of sections 14(a)(1) and 14(a)(5) of the Illinois Educational Labor Relations Act (Educational Act) (115 ILCS 5/14(a)(1), (a)(5) (West 2000)). The ALJ's recommended decision and order was supported by findings of fact and law and required the University to bargain in good faith over the issue of parking and parking fees. 19 Pub. Employee Rep. (Ill.) par. 150.

The IELRB reviewed the recommended decision and adopted the ALJ's findings of fact. While the IELRB agreed with the

determination that parking was a term and condition of employment, the majority believed that parking-related issues were within the purview of the University's inherent managerial authority. *Service Employees International Union, Local 73, Chapter 119*, 20 Pub. Employee Rep. (Ill.) par. 40, Nos. 2001–CA–0044–S, 2003–CA–0005–S (IELRB March 22, 2004). The majority then applied the third step of the *Central City* test, finding that the benefits of bargaining the issue of parking and parking fees outweighed the burden it imposed on the University's inherent managerial authority. 20 Pub. Employee Rep. (Ill.) par. 40. Accordingly, the IELRB upheld the ALJ's finding that the University had engaged in unfair labor practices and must collectively bargain on parking issues. A partial dissent to this decision disagreed with the conclusion that the benefits of bargaining parking fees demonstrably outweighed the burdens of bargaining on the University's managerial authority. 20 Pub. Employee Rep. (Ill.) par. 40, at 264 (Snyder, dissenting in part).

The appellate court reviewed the cause and reversed the IELRB's decision. 359 Ill. App. 3d at 1124. The court asserted that the IELRB's finding that parking fees involved a term and condition of employment was not clearly erroneous, but the majority held the finding that, on balance, the benefits of bargaining outweighed the burdens was clearly erroneous. The court did not consider whether parking fees were a matter of the University's inherent managerial authority, the second prong of the *Central City* test, because that issue was not raised by the parties. 359 Ill. App. 3d at 1122-24. Acknowledging that the issue was not before the court, the dissent nonetheless stated that parking fees were not part of the University's inherent managerial authority. The dissent concluded that the majority ignored its limited role on review by overturning the IELRB's balancing decision. 359 Ill. App. 3d at 1124-25 (Myerscough, J., specially concurring in part and dissenting in part). Both the SEIU and the IELRB filed petitions for leave to appeal, and this court allowed the petitions. 210 Ill. 2d R. 315.

In the other cause in this consolidated appeal, the Illinois Fraternal Order of Police Labor Council (FOP) filed two unfair labor practice charges against the University, similar to those raised in the SEIU case. As a part of ongoing negotiations with the University, the FOP had submitted a proposal containing additional language stating that:

"[t]he Employer shall provide bargaining unit members with a parking space for their personal vehicles while on duty in a location reasonably close to their assignment or work, or alternatively, reimburse them for the cost of obtaining same." As in the SEIU cause, the University refused to bargain, maintaining that parking proposals were not mandatory bargaining subjects.

After a full evidentiary hearing, the ALJ issued a recommended decision and order supported by findings of fact and law. The ALJ concluded that the FOP's parking proposals were mandatory subjects of bargaining and that the University's refusal to bargain in good faith was a violation of sections 10(a)(1) and 10(a)(4) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1), (a)(4) (West 2000)). This decision was based on the ALJ's findings that the FOP's parking proposal concerned a term or condition of employment, but did not involve inherent managerial authority. *Illinois Fraternal Order of Police Labor Council*, 20 Pub. Employee Rep. (Ill.) par. 84, Nos. S–CA–02–038, S–CA–02–048 cons. (ILB, State Panel, May 14, 2004). The University brought the case before the Illinois Labor Relations Board (ILRB). The ILRB upheld the ALJ's decision, agreeing that the proposal did not affect the University's inherent managerial authority. 20 Pub. Employee Rep. (Ill.) par. 84.

On administrative review, the appellate court reversed the decisions of the ALJ and the ILRB. 361 Ill. App. 3d at 269. The court determined that the ALJ's conclusion that parking and parking fees constituted terms and conditions of employment was not erroneous, but the majority believed it was clear error to find that parking and parking fees were not part of the University's inherent managerial authority. 361 Ill. App. 3d at 268. Next, the majority applied the third prong of the *Central City* test, finding that the significant burdens that bargaining placed on the University outweighed its limited benefits. Thus, the parking issue presented only a permissible subject for bargaining, not a mandatory one. 361 Ill. App. 3d at 269. The dissent asserted that the analysis should have ended with the second prong of the *Central City* test because the ILRB's finding that parking issues did not affect the University's inherent managerial authority should not have been overturned as clearly erroneous. 361 Ill. App. 3d at 269 (Myerscough, J., dissenting).

Both the FOP and the ILRB filed petitions for leave to appeal. This court allowed the petitions (210 Ill. 2d R. 315) and consolidated the appeals of the underlying cause of action with those filed by the SEIU and the IELRB. We allowed the Illinois Education Association–NEA leave to file a brief as *amicus curiae* in support of the IELRB's order. 210 Ill. 2d R. 345.

## II. ANALYSIS

In this appeal, we consider whether the appellate court properly applied the standard of review in overturning the decisions of the IELRB and the ILRB (Boards) and holding that the University's refusal to bargain was not an unfair labor practice because the parking-related proposals of the SEIU and the FOP (unions) were not mandatory subjects of collective bargaining. We begin our analysis with the applicable statutes.

The purposes of the two statutory schemes are similar. The Act is intended to "regulate labor relations between public employers and employees," specifically excluding labor relations between "educational employees" and "educational employers." 5 ILCS 315/2 (West 2000). Labor relations between the latter two groups are governed by the Educational Act (115 ILCS 5/1 (West 2000)). "[P]eace officers employed by a State university" are specifically excluded from coverage by the Educational Act (115 ILCS 5/2(b) (West 2000)), however, and are deemed "public employee[s]" by the Act (5 ILCS 315/3(n) (West 2000)). Thus, the charges of unfair labor practices filed against the University by the FOP are governed by the Act and fall under the jurisdiction of the ILRB (5 ILCS 315/5 (West 2000)). The charges filed by the SEIU are governed by the Educational Act, under the jurisdiction of the IELRB (115 ILCS 5/5 (West 2000)).

In relevant part, the Act and the Educational Act similarly define an unfair labor practice to include both an employer's interference with, restraint of, or coercion of "employees in the exercise of the rights guaranteed" by the statutes (5 ILCS 315/10(a)(1) (West 2000); 115 ILCS 5/14(a)(1) (West 2000)) and an employer's refusal to engage in good-faith collective bargaining with the exclusive

representative of "employees in an appropriate unit" (5 ILCS 315/10(a)(4) (West 2000); 115 ILCS 5/14(a)(5) (West 2000)).

In *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 523 (1992), this court adopted a three-part test for determining whether an issue is subject to mandatory bargaining under the Educational Act. In remanding the cause in *Central City*, we explained that "the application of this test requires a detailed factual analysis that the IELRB is particularly well suited to examine." *Central City*, 149 Ill. 2d at 524. This court has since also applied the *Central City* test in cases arising under the Act. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 206 (1998)). Thus, we will examine each of the consolidated cases under this test.

In step one, the *Central City* test considers whether the issue "is one of wages, hours and terms and conditions of employment," a question "the [Boards are] uniquely qualified to answer." *Central City*, 149 Ill. 2d at 523. If the issue does not involve wages, hours, and terms and conditions of employment, the employer need not bargain over it, and the analysis is complete. If it does, the second step is to determine whether the issue is "one of inherent managerial authority." *Central City*, 149 Ill. 2d at 523.

"Inherent managerial authority" was further defined in *Ford Motor Co. v. National Labor Relations Board* as those matters residing " 'at the core of entrepreneurial control.' " *Ford Motor Co. v. National Labor Relations Board* , 441 U.S. 488, 498, 60 L. Ed. 2d 420, 429, 99 S. Ct. 1842, 1850 (1979), quoting *Fibreboard Paper Products Corp. v. National Labor Relations Board*, 379 U.S. 203, 223, 13 L. Ed. 2d 233, 246, 85 S. Ct. 398, 409 (1964) (Stewart, J., concurring, joined by Douglas and Harlan, JJ.). This definition was quoted with approval in *Central City*. *Central City*, 149 Ill. 2d at 518. If the issue does not involve the employer's inherent managerial authority, then it is subject to mandatory bargaining. If it does, the analysis proceeds to the third and final step. *Central City*, 149 Ill. 2d at 523.

The final step is a balancing test, weighing "the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority." *Central City*, 149 Ill. 2d at 523. In this step, the determination of whether an issue is a subject of mandatory bargaining is "very fact-specific," and the

Boards are "eminently qualified to resolve" that question. *Central City*, 149 Ill. 2d at 523.

Judicial review of decisions issued by the Boards is necessarily limited by the Administrative Review Law. 735 ILCS 5/3–110 (West 2000); 5 ILCS 315/11(e) (West 2000). As we explained in *City of Belvidere*, the clearly erroneous standard of review is proper when reviewing a decision of the IELRB or the ILRB because the decision represents a mixed question of fact and law. *City of Belvidere*, 181 Ill. 2d at 205. An agency decision will be reversed because it is clearly erroneous only if the reviewing court, based on the entirety of the record, is " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 2d 746, 766, 68 S. Ct. 525, 542 (1948). While this standard is highly deferential, it does not relegate judicial review to mere blind deference of an agency's order. *AFM Messenger*, 198 Ill. 2d at 395.

### A. Step One of the *Central City* Test

Prior to applying the first step of the *Central City* test, we must address a motion filed jointly by the IELRB and the ILRB. In the motion, the Boards seek to strike the University's request for cross-relief and its reply brief addressing that request because the University had already received full relief from the appellate court and was merely seeking to present an alternative argument supporting those courts' judgments. We agree with the Boards' view of the University's actions. Its request for cross-relief raises only the issue of whether the appellate court properly favored the position of the Boards and the unions in step one of the *Central City* test. Thus, we grant the Boards' motion in part, striking the University's reply brief as improper. See 210 Ill. 2d R. 315(h) (permitting the appellee to file a reply brief only "[i]f the brief of the appellee contains arguments in support of cross-relief"). We will, however, treat the University's request for cross-relief as an additional argument for upholding the appellate court's judgments and decline the Boards' suggestion to strike it entirely.

On the substantive issue, the University contends that the Boards erred by concluding that the unions' proposals involved "wages, hours and terms and conditions of employment," step one of the *Central City* test (*Central City*, 149 Ill. 2d at 523). Thus, we must determine whether the appellate court properly found that the Boards' decisions were not clearly erroneous. The parties' arguments focus on whether the proposals affected a "term or condition of employment."

The University contends that parking in University lots is not a condition of employment because employees are not required to use these facilities. Parking is merely a "service" for employees, students, and the general public alike. As a general service, parking is completely outside the scope of the employees' working conditions and cannot logically be deemed a term or condition of employment. Notably, the University asserts this position while adamantly maintaining in another part of its argument that adequate parking services are "essential" to the ability of its students to access their academic buildings. The University distinguishes *Ford Motor Co.*, 441 U.S. 488, 60 L. Ed. 2d 420, 99 S. Ct. 1842, relied on heavily by the Boards, and cites decisions by the New York Public Employment Board finding that a $5 annual vehicle registration fee applicable to all students, employees, and campus visitors was not subject to mandatory bargaining because it was not related to employment status (see, *e.g.*, *Council 82 AFSCME*, 26 N.Y. Pub. Employee Rep. (LRP) par. 4615 (1993); *State of New York (State University of New York at Binghamton)*, 19 Pub. Employee Rep. par. 3029 (1986)).

In *Ford Motor Co.*, the Supreme Court held, in relevant part, that the food services and prices offered in the employer's plant constituted terms and conditions that were obviously relevant to the employees' work environment. The Court noted that "[i]t reasonably follows that the availability of food during working hours and the conditions under which it is to be consumed are matters of deep concern to workers, and one need not strain" to find that this issue constituted a term or condition of employment, triggering a mandatory duty to bargain. *Ford Motor Co.*, 441 U.S. at 498, 60 L. Ed. 2d at 428-29, 99 S. Ct. at 1849. The University attempts to distinguish this case on its facts because in-plant food prices applied only to employees and "intimately affected" workers, who had no reasonable alternatives during their workday. We reject that argument,

finding that the rationale in *Ford Motor Co.* supports the opposite conclusion.

The Court in *Ford Motor Co.* added that while a worker's interest in concern about the availability of food during the workday was justifiable,

> "*[b]y the same token, where the employer has chosen, apparently in his own interest, to make available a system of in-plant feeding facilities* for his employees, the prices at which food is offered and other aspects of *this service may reasonably be considered among those subjects about which management and union must bargain*." (Emphases added.) *Ford Motor Co.*, 441 U.S. at 498, 60 L. Ed. 2d at 429, 99 S. Ct. at 1849.

Here, the record shows that the majority of union employees commute to work by car and that the University has chosen to provide a system of parking lots and structures for their use. It is undisputed that the University is not in the business of providing parking services. The University argues that the facts in *Ford Motor Co.* are distinguishable because while the University's parking facilities are open to the students, faculty, and other staff, and the general public, as well as to union employees, the cafeteria facilities in *Ford Motor Co.* were used only by employees.

We are unconvinced by the University's argument. The relevant analysis in *Ford Motor Co.* does not rely on either employees' mandatory or employees' exclusive use of the employer's ancillary services. Indeed, the Court cited with approval National Labor Relations Board cases stating that the possibility of alternative service options was not sufficient to preclude cafeteria food prices from the scope of mandatory bargaining issues. *Ford Motor Co.*, 441 U.S. at 493 n.6, 60 L. Ed. 2d at 425 n.6, 99 S. Ct. at 1847 n.6. The key to the analysis is the critical relationship these auxiliary services have to employees' working lives. Both here and in *Ford Motor Co.*, the auxiliary services affect workers' welfare and permit them to perform their duties in a timely and efficient manner. Due to the nature of the services offered in *Ford Motor Co.*, there was little reason for the public to use the cafeteria facilities. In contrast, the University's parking facilities are in high demand by a large number of diverse groups. The wider demand placed on limited University parking

-9-

services compared to Ford Motor Company's food services does not necessitate a different analysis or result. Indeed, that high demand places even more pressure on the limited alternative parking available to FOP and SEIU members.

As the ALJs in both the FOP and the SEIU cases noted, the feasible alternative parking options available to union employees were often extremely limited, highly competitive, and their use was not conducive to workplace efficiency. In the findings of fact, the ALJ in the SEIU case noted that approximately 90% of the union's members drive to work and that about half start their workday before the City of Urbana allows on-street parking in nearby residential areas. Moreover, some streets near the University have parking restrictions, and parking problems are exacerbated during daylight hours, when demand is at a peak. Even SEIU members who work night shifts in some departments have difficulty finding on-street parking due to parking restrictions and limited quantity. 19 Pub. Employee Rep. (Ill.) par. 150. The IELRB agreed with the ALJ's finding that the SEIU's parking proposal involved terms and conditions of employment, and, as we stated in *Central City*, we believe the labor board is "particularly well suited to examine" this type of "detailed factual analysis." *Central City*, 149 Ill. 2d at 524; 20 Pub. Employee Rep. (Ill.) par. 40.

The ALJ in the FOP case found that "most if not all of the [FOP members] drive personal vehicles to and from their jobs" and that the record contains no evidence establishing the sufficiency, availability, or cost of private parking options. The ALJ also noted that the record fails to show that alternatives such as bus service, city parking lots, and free or metered on-street parking spaces were adequate or consistently available. The ALJ stated that metered municipal parking lots and some metered on-street parking are not available 24 hours a day, when FOP members are required to be available for duty. In addition, free on-street parking is difficult to locate, particularly during the academic year. 20 Pub. Employee Rep. (Ill.) par. 84. The ILRB affirmed the ALJ's findings, specifically stating that "employee parking in the instant case clearly concerns the wages, hours or terms and conditions of employment of unit employees." 20 Pub. Employee Rep. (Ill.) par. 84, at 481 n.1. As we have noted, the ILRB is "well

suited" to evaluate the factual findings in these cases. *Central City*, 149 Ill. 2d at 524; 20 Pub. Employee Rep. (Ill.) par. 84.

Even if metered street parking reasonably close to the workplace could be reliably found, as the ALJ in the FOP case recognized, the workday would be repeatedly disrupted by a worker's need to add money to the parking meter or risk a parking ticket. Moreover, the FOP asserts that its peace officers must be available for changing job assignments and overtime work requiring access to equipment they transport in their private vehicles, making reliable nearby parking critical to their ability to perform their jobs. The integral role that adequate parking plays in any employee's ability to get to the workplace in a timely manner and to perform daily duties without outside disruptions due to parking factors is self-evident. The Boards' decision is entitled to significant deference (*AFM Messenger*, 198 Ill. 2d at 395), and their decision that the unions' parking proposals related to a term or condition of employment is not clearly erroneous.

## B. Step Two of the *Central City* Test

Turning to the second step of the *Central City* test, we first consider whether the parking issues raised in the FOP's case affect a matter of inherent managerial authority. The University offers a two-pronged argument supporting its contention that the parking issues raised in the FOP's proposal are an inherent component of its managerial authority.

First, the University argues that its parking division is legislatively required to be self-funding. Thus, to pay for large-scale construction of parking lots and structures, the University generally sells long-term bonds to investors. Parking fees are then used to provide a consistent revenue stream to finance lot maintenance and to service the bond debt.

The University's parking plan is integrated into its "campus master plan" that identifies long-term needs for new academic services and buildings. Historically, the University has located new academic buildings on parking lots, then replaced the lost surface parking with parking structures. The University asserts that the FOP proposals relating to the cost and location of parking impact its ability to finance parking maintenance and construction and, ultimately, to construct

new academic buildings on the site of former parking lots. Therefore, the University claims that parking issues affect its inherent managerial control by indirectly altering its ability to provide for the future needs of its academic services.

The University argues that the parking proposals also implicate its essential academic functions by impacting student services. It maintains that parking is a critical student service because it provides access to academic services much the same way running water and electricity provide for a student's well-being during study sessions. Therefore, the University concludes that any proposal seeking to reduce parking fees necessarily infringes on the core of its managerial authority.

We are not persuaded by the University's arguments. Section 4 of the Act states that "[e]mployers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the *functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees.*" (Emphasis added.) 5 ILCS 315/4 (West 2000). We note that the Educational Act contains a nearly identical provision. 115 ILCS 5/4 (West 2000) (recognizing that "[e]mployers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees and direction of employees").

While the statutory list is not exhaustive, it establishes the characteristics of managerial rights that are not subject to mandatory bargaining. Although the University attempts to link the financial consequences of making changes in its parking fees to its overall budget, this connection must fail. According to the University's own argument, the parking division is required to be completely self-funding. If so, then funding options for the parking division cannot affect the University's overall budget because other funds in the general budget could not be used to supplement the parking division finances.

In addition, the University argues that its inherent managerial rights are infringed because financing additional parking structures to

replace surface parking lots used to site new academic buildings is dependent on a reliable stream of revenue from parking fees. Thus, it contends that the construction of new academic buildings depends on the ability of the parking division to finance, maintain, and operate new parking facilities. We reject this argument.

The University's attempt to bootstrap its overall budgetary considerations to the independently financed parking division budget must also fail. Its core management authority is implicated only if the final collective-bargaining agreement does not provide for sufficient parking revenue to sustain the parking division's ongoing and future financial obligations. Not only is that argument purely speculative, but it also misses the crux of the inquiry in step two of the *Central City* test. The question is not *how* core managerial rights may be indirectly affected under some conceivable outcome of the bargaining process. That question assumes that the proposal under consideration impacts the employer's core entrepreneurial control and is properly examined in *Central City*'s third step balancing test. Step two of the test addresses only whether or not the issues raised in the proposal actually affect inherent managerial authority.

In addition, the ILRB specifically rejected the University's assertion that parking fees were a matter of inherent managerial authority because bargaining on fees could destabilize its projected revenue stream for parking projects. As the ILRB explained, the connection between parking fees and the issuance of revenue bonds to fund parking projects does not turn the fee issue into a matter of inherent managerial authority. Rather, that connection is relevant to the balancing of interests that takes place in step three of the *Central City* test. That step is not reached, however, unless the proposal impinges the employer's inherent managerial authority, the question currently under examination.

As for the University's argument that parking issues indirectly affect essential academic functions by impacting students' access, we find the rationale in *Ford Motor Co.* instructive. In *Ford Motor Co.*, the Court explicitly recognized that the employer was not in the business of selling food to employees, concluding that the incidental act of setting prices on food sold in the manufacturing plant was outside the managerial decisions that lie at the core of the employer's entrepreneurial control. *Ford Motor Co.*, 441 U.S. at 498, 60 L. Ed.

2d at 429, 99 S. Ct. at 1850. Here, the University itself deems its parking division to serve an "auxiliary" function. While student parking is an appropriate consideration for the University, that does not necessitate it being deemed an integral part of inherent managerial authority. Indeed, the IELRB determined that parking fees were not a matter of inherent managerial authority in *Southern Illinois University Edwardsville Professional Staff Ass'n*, 15 Pub. Employee Rep. (Ill.) par. 1063 (IELRB September 22, 1998), *aff'd*, 306 Ill. App. 3d 1189 (1999) (unpublished order under Supreme Court Rule 23).

The University argues that this approach is overly restrictive and would not recognize a land-use proposal's infringement on management rights if the employer had no immediate plan for the land. This argument fails to address the relevant issues here. The FOP's proposal merely discussed the amount and allocation of the costs of parking "reasonably close" to work. It did not attempt to control or demand access to specific parking lots or limit the University's ability to later convert those locations to the site of new academic facilities. The University's contention is far too speculative to require a finding that the FOP's proposal infringed on its core entrepreneurial control.

Looking at the record in its entirety, we cannot say that we are " 'left with the definite and firm conviction' " that the ILRB erred by finding the FOP parking proposal did not concern matters that affect the University's inherent managerial rights. See *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001), quoting *United States v. United States Gypsum Co.* 333 U.S. 364, 395, 92 L. Ed. 2d 746, 766, 68 S. Ct. 525, 542 (1948). The appellate court erred in reversing the ILRB's analysis on step two of the *Central City* test and proceeding to step three of that test. The FOP's parking proposal is subject to mandatory bargaining.

In the SEIU case, the union did not raise the second step of the test in the appellate court. We note, however, that the applicable law is identical and the relevant facts are virtually indistinguishable from the FOP case. The FOP's proposal states that: "[t]he Employer shall provide bargaining unit members with a parking space for their personal vehicles while on duty in a location reasonably close to their assignment or work, or alternatively, reimburse them for the cost of obtaining same." The SEIU's proposal specifies fees for spaces in

parking lots "close in proximity to [union members'] work stations," with those fees varying according to the desired time of day and type of parking.

Both proposals address employees' access to appropriate parking and the cost to employees and, thus, effectively address the same fundamental parking issues. We note that although the two proposals suggest differing starting points for negotiations, neither demands that the University provide guaranteed employee parking spaces at immutable locations on campus. Given the identical subject matter of the FOP and SEIU parking proposals, the effect of each proposal on the University's inherent managerial authority logically must be the same.

We also note that step two of the *Central City* test examines whether a union proposal addresses an issue "of *inherent* managerial authority." (Emphasis added.) *Central City*, 149 Ill. 2d at 523. The scope of that authority is intrinsic to the employer and is independent of the identity of the union offering the proposal. The intrinsic nature of that authority precludes this court from proceeding to step three in the SEIU case when we have already held that the FOP's parking proposal on the same subject matter does not implicate that same employer's inherent managerial authority.

Moreover, application of the balancing test in step three hinges on a finding in step two that the union proposal affects the scope of the employer's inherent managerial authority. *Central City*, 149 Ill. 2d at 523 ("If the answer to the second question is no, then the analysis stops and the matter is a mandatory subject of bargaining"). Indeed, some impact on the employer's inherent managerial authority is an integral part of step three because that step balances the burdens bargaining imposes on managerial authority against the benefits of bargaining on the decisionmaking process. *Central City*, 149 Ill. 2d at 523. Without an affirmative finding at step two, there is simply no legal basis for a step three analysis. The analytical structure of the *Central City* test compels us to conclude our analysis in the SEIU case at step two.

More generally, the interests of consistent jurisprudence also require that we conclude the analysis in the SEIU case with the determination that the union's proposal does not affect the University's inherent managerial rights and, thus, is a subject of

-15-

mandatory bargaining. See *People v. Bolden*, 197 Ill. 2d 166, 178 (2001). Therefore, we need not, and do not, address the arguments of the SEIU and the IELRB on the appellate court's review of the balancing test enumerated in step three of the *Central City* test.

## III. CONCLUSION

We hold that the appellate court erred by overturning the Boards' decisions. The unions' parking proposals involved terms and conditions of the workers' employment and did not affect the University's inherent managerial rights. The proposals are subject to mandatory collective bargaining under the *Central City* test. Accordingly, we reverse the judgments of the appellate court.

*Appellate court judgments reversed.*

JUSTICE GARMAN, dissenting:

The majority characterizes its decision as a consideration of whether the appellate court properly applied the standard of review in overturning the decisions of the Illinois Educational Labor Relations Board (IELRB) and the Illinois Labor Relations Board (ILRB). Ultimately, the majority concludes that the appellate court improperly applied the standard of review in the case involving the ILRB. I believe the majority's decision commits the very same mistake it seeks to remedy. Specifically, I believe the majority decision incorrectly applies the standard of review in its consideration of the second step of the *Central City* test in the IELRB case. *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496 (1992). This failure leads the majority to show no deference to the IELRB and inappropriately preclude analysis of step three of the *Central City* test. It also improperly penalizes the University for this court's choice to consolidate these cases. For these reasons, I respectfully dissent.

As the majority adequately describes, this court adopted a three-part test for determining whether an issue is subject to mandatory bargaining under the Educational Act in *Central City*, and explained that "the application of the test requires a detailed factual analysis that the IELRB is particularly well suited to examine." *Central City*, 149

Ill. 2d at 524. Moreover, the majority notes that this court has applied the *Central City* test in cases arising under the Illinois Public Labor Relations Act, at issue in the ILRB case. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 206 (1998). That being said, the majority explains that it will examine each of the consolidated cases under this test.

Before undertaking its analysis, the majority enunciates the standard of review. As the majority notes, the clearly erroneous standard of review is proper when reviewing a decision of the IELRB or the ILRB because the decision represents a mixed question of fact and law. *City of Belvidere*, 181 Ill. 2d at 205. Under this standard, an agency decision will be reversed only if the reviewing court, based on the entirety of the record, is " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

Necessary to my analysis is a brief recitation of the Boards' dissimilar applications of the *Central City* test, as well as the appellate decisions that followed. Reviewing the findings of fact and the recommended decision of an administrative law judge, the IELRB found that parking was a term and condition of employment, but also believed that parking-related issues were within the purview of the University's inherent managerial authority. A majority of the IELRB thus utilized the third step of the *Central City* test, found that the benefits of bargaining the issues of parking and parking fees outweighed the burden it imposed on the University's inherent managerial authority, and therefore upheld the ALJ's finding that the University had engaged in unfair labor practices. The University appealed, and a majority of the appellate court reversed, finding that the IELRB's decision that the benefits of bargaining outweighed the burdens was clearly erroneous. The appellate court did not consider whether parking fees were a matter of the University's inherent managerial authority because that issue was not raised by the parties.

Reviewing the findings of fact and the recommended decision of a different administrative law judge, the ILRB found that parking was a term and condition of employment and that the FOP's parking proposal did not affect the University's inherent managerial authority.

Like the IELRB, then, the ILRB found that the University's refusal to bargain with the FOP over parking constituted an unfair labor practice. Again, the University appealed and a majority of the appellate court reversed, finding that it was clearly erroneous to hold that parking and parking fees were not part of the University's inherent managerial authority. The appellate majority went on to find that the significant burdens that bargaining placed on the University outweighed its benefits.

Beginning its analysis of *Central City*, the majority concludes that the appellate court panels properly found that the Boards' decisions that the unions' parking proposals involved "wages, hours or terms and conditions of employment" were not clearly erroneous. I agree with the majority on this point. Following this, the majority analyzes the second step of the *Central City* test. It is with this analysis that I disagree.

The majority first considers whether the parking issues raised in the FOP's case affect a matter of inherent managerial authority. After discussing and disagreeing with the University's arguments, the majority revisits the standard of review in conjunction with the findings of the appellate court. The majority states that "[l]ooking at the record in its entirety, we cannot say that we are " 'left with the definite and firm conviction" ' that the ILRB erred by finding the FOP parking proposal did not concern matters that affect the University's inherent managerial rights." Slip op. at 14. Due to that finding, the majority holds that "the appellate court erred in reversing the ILRB's analysis on step two of the *Central City* test and proceeding to step three of that test." Slip op. at 14. Evidently, the majority relied on and was, at least in part, guided by the application of the clearly erroneous standard of review in its holding concerning the ILRB's findings.

In the very next breath, however, the majority completely ignores the clearly erroneous standard in turning from the ILRB case to the IELRB case. Stating that the SEIU did not raise the second step of the *Central City* test in the appellate court, and noting that the relevant facts and law are virtually indistinguishable from the FOP case, the majority concludes the analysis in the SEIU case "with the determination that the union's proposal does not affect the University's inherent managerial rights, and, thus, is a subject of mandatory bargaining." Slip op. at 14.

-18-

The majority fails to adequately support this holding, though, utilizing only a discussion of waiver and pointing to "the interests of consistent jurisprudence." Slip op. at 14. It is true that the SEIU and the IELRB did not raise the second step of the *Central City* test before this court. Instead, they focused their arguments on step three, a balancing of the benefits of bargaining versus the burdens imposed. This fact does not support the majority's conclusion, however.

In *People v. Bolden*, 197 Ill. 2d 166, 178 (2001), this court noted that the forfeiture rule is a limitation on the parties and not on the jurisdiction of the courts and stated that it was going to address an issue raised for the first time on appeal "[r]ecognizing both the importance of this issue and our obligation to maintain a sound and consistent body of case law." *Bolden*, 197 Ill. 2d at 178. The majority in this case utilizes that language in support of its decision to address the second step of the *Central City* test with regards to the IELRB case despite the fact that it was not raised in the appellate court.

This discussion is irrelevant, though, because the forfeiture rule has no bearing on the application of the clearly erroneous standard to the ruling of the IELRB. It is true that this court has the authority to disregard forfeiture in the IELRB case and address the second step of the *Central City* test. However, in addressing step two in the IELRB case, the majority is suggesting that, as a matter of law, it is incorrect to find that parking issues fall within the inherent managerial authority of the University. In other words, the majority is holding that it could never be correct under any circumstance to find that parking issues fall within the University's inherent managerial authority. This is the only possible interpretation of the majority's analysis of the second step in the IELRB case, because the IELRB found that parking *did* fall within the University's inherent managerial authority. In reversing that finding, the majority makes no reference to the clearly erroneous standard.

Unfortunately, the majority offers insufficient support for its holding that it was incorrect as a matter of law–and, consequently, clearly erroneous–for the IELRB, or any other body, to conclude that parking is part of the University's inherent managerial authority. If the majority believes its discussion of the FOP case supports its holding in the IELRB case, it needs to explicitly say so and fully analyze why that conclusion is merited. Without doing so, the majority shows little

-19-

deference to the overall findings of the IELRB, fails to fully address that case, and penalizes the University simply because the SEIU appeal was consolidated with that of the FOP.

In the end, the majority's analysis of the IELRB case eviscerates the clearly erroneous standard of any real meaning and even calls into question its use. On the one hand, the majority utilizes the standard as critical support for its decision, finding that it was not clearly erroneous for the ILRB to find that parking was not part of the University's inherent managerial authority. On the other hand, the majority completely ignores the standard in the SEIU case where the IELRB held that parking was part of the University's inherent managerial authority but the benefits of bargaining over parking outweighed the burdens. If both the ILRB and the IELRB are entitled to equal deference under the clearly erroneous standard, both being uniquely qualified for the decisions with which they are tasked, why does the majority utilize the clearly erroneous standard in reviewing one but not the other?

That one decision was not clearly erroneous does not necessarily make the opposite clearly erroneous. By contrast, that one decision is clearly erroneous necessarily makes the opposite conclusion not clearly erroneous. The majority does not address this point and its reference to forfeiture does little to remedy the oversight. Because of this, the majority fails to properly apply the standard of review and thereby fails to adequately support its overall decision.

The above described failure allows the majority to end its analysis without addressing step three of the *Central City* test, weighing the benefits and burdens of bargaining over a particular matter. It may be that it is not clearly erroneous to find, as the IELRB did, that parking matters are part of the University's inherent managerial authority. In such a situation, analysis under step three would be warranted.

In misapplying the standard of review at step two of the *Central City* test, the majority incorrectly forecloses any analysis of the third step of the test. In failing to undergo any analysis under step three of the *Central City* test, the majority neglects the University's arguments concerning that step, fails to show any deference to the IELRB, and

-20-

penalizes the University for this court's choice to consolidate the FOP and SEIU cases. For these reasons, I respectfully dissent.

JUSTICE KARMEIER joins in this dissent.