(No. 87117.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDWARD BOLDEN, Appellant.

*Opinion filed June 21, 2001.—Rehearing denied October 1, 2001.*

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin and James N. Perlman, Assistant Public Defenders, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb, Kenneth T. McCurry, Theodore Fotios Burtzos and Margaret J. Campos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THOMAS delivered the opinion of the court:

The defendant, Edward Bolden, was convicted of the first degree murders of two persons and of the attempted first degree murder and aggravated battery of a third person. The defendant was sentenced to natural life imprisonment for the two murder convictions and to a consecutive term of 30 years' imprisonment for attempted murder. The appellate court affirmed the defendant's convictions and sentences in an unpublished order. No. 1—96—4221 (unpublished order under Supreme Court Rule 23). We allowed the defendant's peti-

tion for leave to appeal (177 Ill. 2d R. 315(a)), and we now affirm the judgment of the appellate court.

Before this court, the defendant raises two issues concerning a lineup he voluntarily participated in before he was charged with any offense in this case. The defendant also challenges one of the jury instructions used at his trial, as well as the trial judge's exclusion of certain related evidence. Given the nature of the issues raised by the defendant, we will provide only a brief summary of the trial evidence and a more detailed recitation of the testimony introduced at the suppression hearing.

## BACKGROUND

According to the evidence presented at trial, on January 29, 1994, the three victims in this case—Clifford Frazier, his brother, Derrick Frazier, and a third man, Irving Ledell Clayton—went to J&J's Fish Store at 64th Street and Cottage Grove Avenue in Chicago to sell three kilograms of cocaine. Upon arriving at the fish store, they entered the building and spoke to "Ant" Williams, with whom they had engaged in similar transactions in the past. Clifford Frazier testified that he was asked to leave the store because he was armed, so he went across the street to another restaurant, ordered some food, and watched the fish store from a window. After about five minutes, Clifford saw a man enter the fish store and shake hands with Williams, Derrick Frazier, and Ledell Clayton. After another 5 or 10 minutes, Derrick, Ledell, and the man entered the restaurant where Clifford was waiting. As Derrick and Ledell spoke with Clifford, the man got change and left the building.

Clifford testified that Derrick and Ledell next got into Derrick's car with the man and drove off. Clifford Frazier then left the restaurant and moved his car to a nearby vacant lot. According to Clifford, two suspicious-looking men came out of a building and walked to a car behind his. Clifford got out of his own vehicle, opened

the hood, and watched the two men. Clifford testified that after 10 to 15 minutes, the man who had earlier driven off with Derrick and Clayton approached on foot, shouted "Freeze," and started firing a gun at him. Clifford ran off but was struck in the back and the leg. Clifford ran to the fish store, but the door was locked and no one would let him in. The man caught up with Clifford, and the two struggled. Clifford fell, and the man ran off. At trial, Clifford identified the defendant as the man who had shot him.

Derrick Frazier and Ledell Clayton were found a few blocks away in Derrick's car; both of them had been shot a number of times in the head at close range. Derrick was dead, and Ledell died the next day. Investigators learned that the defendant, who fit a description provided by the surviving victim, Clifford Frazier, had talked with "Ant" Williams earlier, and they subsequently attempted to contact the defendant at his mother's house.

According to the testimony presented at the suppression hearing, the defendant retained counsel, and his lawyer, Charles Ingles, later contacted the police in response to the detectives' inquiries. The defendant eventually agreed to meet with the detectives. Following some delay, the defendant and his lawyer went to Area 2 headquarters on February 26, 1994. At that time, the defendant was not under arrest and had not been charged with any offense in connection with this case. At the police station, the defendant agreed to take part in a lineup. The lineup consisted of five persons, including the defendant; because of disparities in height, the participants were seated. The witness, Clifford Frazier, viewed the lineup through a one-way mirror from an adjacent room.

Called as a witness by the defendant, Detective Angelo Pesavento testified at the suppression hearing that the defendant was given his choice of which seat to take, and he chose the fourth seat. Pesavento also testified

that he told the defendant's lawyer, Charles Ingles, that Ingles could not be in the same room with the witness during the lineup but that he was welcome to remain with the defendant. According to Pesavento, Ingles chose instead to wait in an office outside. Detective Pesavento stood with the witness in the viewing room. Pesavento testified that the witness readily identified the defendant as the person who had fired shots at him. Pesavento denied that the defendant was told where to sit and that the defendant later changed chairs with another participant. Pesavento also denied that an officer walked into the lineup room and addressed the defendant by name during the procedure and that Frazier was prompted in any way in making his identification.

Also testifying at the suppression hearing was Charles Ingles, the lawyer who had represented the defendant at the time of the lineup. Ingles stated that he contacted the police after he learned that the police were trying to reach the defendant. The defendant agreed to meet with the police, and Ingles and the defendant went to Area 2 headquarters on February 26, 1994. After some initial questioning by the detectives, the defendant agreed to take part in a lineup. Ingles testified that he told the detectives that the defendant would participate in a lineup if counsel could be present. According to Ingles, one of the detectives responded that that would be all right. The defendant was later placed in a lineup room. Ingles saw the witness, who had walked by the defendant and counsel earlier, go into the viewing room. Ingles said that he started to follow the witness and Detective Pesavento into the viewing room but that Pesavento barred his way. Ingles reminded the detective of their agreement, that the lawyer could be present during the lineup; Pesavento replied that he was present.

The defendant also testified at the suppression hearing. The defendant stated that, after speaking with po-

lice detectives, he agreed to take part in a lineup if his lawyer could be present. The defendant said that he was then taken to the lineup room, which contained five chairs; four of them were already occupied. According to the defendant, he was told to sit in the empty chair, which was the first one. The door to the room was then closed. The defendant said that he then switched seats with the person sitting in the fourth chair. After changing places, the defendant saw the witness on the other side of the window come to the glass and point to the person sitting in the first chair. The defendant described the witness as chubby and said that he was wearing a green sweatshirt and a gold chain with the letter "D" on it. The defendant testified that he then saw the detective in the viewing room put his head out the door; the detective who was outside the lineup room next opened the door, stuck his head in, and said " 'You, Eddie Bolden, right?' " The defendant did not reply. The detective again said, " 'Eddie Bolden, right?' " and gave the defendant's address. This time the defendant replied in the affirmative. The detective then told the persons in the lineup room to stand up, and they did. The defendant testified that he was next able to see the witness in the other room move down to where the defendant was standing, and he could see the detective say something to the witness. The witness shook his head no and tried to walk away, but the detective grabbed him, brought him back to the glass, and said something again, and the witness then nodded his head yes.

Appearing on behalf of the State at the suppression hearing, Officer Joe Barnes testified that he was one of the participants in the defendant's lineup. Barnes stated that he, the defendant, and three other men entered the lineup room together that afternoon. A detective told the defendant that he could sit wherever he liked, and the defendant chose to sit in the fourth chair. The lineup was

then conducted. Barnes stated that persons in the lineup room were not able to see or hear persons in the viewing room. Barnes denied that the defendant switched places with anyone and that a detective entered the room and called out the defendant's name during the lineup.

Detective George Karl also testified on behalf of the State at the suppression hearing. Karl stated that the defendant's lawyer, Charles Ingles, asked to be with Frazier during the lineup. Karl told Ingles that the lawyer could not be with the witness but that he could be with the defendant. Karl said that Ingles instead stayed in a nearby conference room or squad room during the course of the lineup. Detective Karl further testified that the defendant was given his choice of chairs in the lineup room and that the defendant selected the fourth seat. Karl denied that the defendant initially sat in the first chair and then switched places. Karl also stated that a person in the lineup room could see into the adjacent witness room only by putting his head right against the one-way mirror that separated the two rooms. Detective Karl stated that when the witness, Clifford Frazier, arrived at the police station, the detectives did not have him walk by the defendant. Karl denied that anyone called out the defendant's name during the procedure.

At the conclusion of the hearing, the trial judge denied the defendant's motion to suppress the lineup identification. The judge concluded that the defendant's constitutional rights were not violated by the detectives' refusal to permit defense counsel to be with the witness during the lineup. The judge believed that the police had been more than accommodating in this case, because they had gone beyond what the law required in suggesting that defense counsel could be with the defendant during the lineup. The judge also rejected the defendant's separate contention that the lineup was suggestive.

The preceding witnesses testified similarly at trial

when they were questioned about the circumstances surrounding Frazier's identification of the defendant in the lineup. The eyewitness in this case, Clifford Frazier, had not testified at the suppression hearing, and at trial he said he did own a necklace like the one described by the defendant, but he could not recall whether he had worn it on the day of the lineup.

Following the presentation of evidence, the jury found the defendant guilty of the first degree murders of Derrick Frazier and Irving Ledell Clayton and of the attempted first degree murder and aggravated battery of Clifford Frazier. A capital sentencing hearing then commenced. The jury found the defendant eligible for the death penalty on the ground that he had murdered two or more persons. After the presentation of evidence in aggravation and mitigation, the jury was not able to unanimously conclude that the defendant should be sentenced to death. The judge subsequently sentenced the defendant to natural life imprisonment for the two first degree murder convictions and to a consecutive term of 30 years' imprisonment for his conviction for attempted first degree murder. The judge concluded that the conviction for aggravated battery merged into the conviction for attempted first degree murder and therefore did not impose any sentence for the former offense.

The appellate court affirmed the defendant's convictions and sentences in an unpublished order. No. 1—96—4221 (unpublished order under Supreme Court Rule 23). The appellate court concluded that the evidence was sufficient to establish the defendant's guilt for those offenses. The court also rejected the defendant's contention that the lineup identification should have been suppressed because counsel was not allowed to observe it. In addition, the court held that the jury was properly instructed in this case, that there was no error in the exclusion of certain evidence at trial, and that certain

comments by the prosecution were either proper or did not constitute reversible error. One member of the appellate panel dissented, believing that the lineup was constitutionally flawed because counsel had not been allowed to view the lineup as it proceeded. We allowed the defendant's petition for leave to appeal. 155 Ill. 2d R. 315(a).

## ANALYSIS

### I

The defendant first argues that the lineup identification must be suppressed because the police failed to honor his lawyer's request that counsel be permitted to observe the lineup and the witness' identification of the defendant. In essence, the defendant contends that a person who is represented by counsel and who has agreed to take part in a lineup has a right, as a matter of due process, to have counsel present during the identification process. The defendant recognizes that there is generally no constitutional right to counsel when a person is placed in a lineup prior to the initiation of adversary proceedings, but he argues that the present case is different because he was already being represented by counsel and because the detectives had previously agreed to permit counsel to view the lineup.

Prior to the initiation of adversary proceedings, a person does not have a constitutional right to counsel when he takes part in a lineup. The sixth amendment right to counsel does not attach until the initiation of adversary proceedings against the person, whether by formal charge, preliminary hearing, indictment, information, or arraignment. *Moran v. Burbine*, 475 U.S. 412, 429-30, 89 L. Ed. 2d 410, 426-27, 106 S. Ct. 1135, 1145-46 (1986); *Kirby v. Illinois*, 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82 (1972) (plurality opinion); *United States v. Wade*, 388 U.S. 218, 226-27, 18

L. Ed. 2d 1149, 1156-57, 87 S. Ct. 1926, 1931-32 (1967); *People v. Garrett*, 179 Ill. 2d 239, 247-48 (1997).

At that time a person also does not possess a right to counsel under the fifth amendment. A person's appearance in a lineup is nontestimonial in nature and does not constitute interrogation; for these reasons, identification evidence stemming from a lineup does not implicate any fifth amendment concerns. *Kirby*, 406 U.S. at 687-88, 32 L. Ed. 2d at 416-17, 92 S. Ct. at 1881; *Wade*, 388 U.S. at 221-23, 18 L. Ed. 2d at 1154-55, 87 S. Ct. at 1929-30; *People v. Nelson*, 40 Ill. 2d 146, 152 (1968). As the United States Supreme Court explained in *Wade*:

> "We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have." *Wade*, 388 U.S. at 222, 18 L. Ed. 2d at 1154-55, 92 S. Ct. at 1930.

The defendant acknowledges that he had no right to counsel at the lineup under the preceding authorities. He believes that a different rule must apply in his case, however, because he was already represented by counsel and because the detectives had agreed to permit counsel to observe the lineup. The defendant contends that these circumstances conferred on him a right under due process to have counsel present during the lineup. In support of this proposition, the defendant relies primarily on a line of cases from New York, in which courts of that state have concluded that a person who is represented by counsel is entitled to have the lawyer view a lineup in which the client appears, even though adversary proceedings have not yet been initiated against the client.

The New York cases cited by the defendant base their result on an interpretation of that state's own constitution and public policy. See *People v. Wilson*, 89 N.Y.2d

754, 680 N.E.2d 598 (1997); *People v. Hawkins*, 55 N.Y.2d 474, 435 N.E.2d 376 (1982); *People v. Blake*, 35 N.Y.2d 331, 320 N.E.2d 625 (1974); *People v. Lennon*, 243 A.D.2d 495, 662 N.Y.S. 821 (1997). In contrast to the New York decisions, our own cases have previously declined to recognize a right to counsel in circumstances similar to the ones here. Thus, in *People v. McCauley*, 163 Ill. 2d 414 (1994), this court declined to hold that a defendant who was represented by counsel was entitled to have counsel present during a lineup. *McCauley*, 163 Ill. 2d at 447. Although the court in that case concluded that a defendant for whom a lawyer has been retained must be told, prior to any interrogation, that counsel is available for consultation, the court declined to impose a similar requirement with respect to lineups. See also *People v. Garrett*, 179 Ill. 2d 239 (1997).

The defendant contends that *McCauley* is distinguishable, however, because the defendant in that case was already under arrest and therefore could be compelled to appear in a lineup. The present defendant was not yet under arrest at the time of the lineup, and he argues that a different rule should therefore apply in these circumstances. We do not agree. We do not believe that the defendant's status as a person not under arrest at the time of the lineup conferred on him a constitutional right to the assistance of counsel. In fact, the absence of an arrest would seem to argue for the opposite conclusion. If the defendant was free to leave, he could have simply done so, and thus one option in this case was for the defendant to refuse to take part in the lineup if counsel was barred from assisting him.

## II

The defendant raises an additional argument concerning the lineup identification. He contends that the refusal of the police to permit his lawyer to observe the witness during the lineup converted his voluntary appearance at

the police station into a seizure by the detectives. As a preliminary matter, the State contends that the defendant has waived consideration of this issue by his failure to raise it in the courts below. See *Parks v. Kownacki*, 193 Ill. 2d 164, 180 (2000); *Jones v. Chicago HMO Ltd.*, 191 Ill. 2d 278, 306 (2000).

This point was first raised by the dissenting justice in the appellate court, who believed that the detectives' refusal to permit counsel to observe the witness make the identification transformed the defendant's voluntary appearance at the police station into an involuntary seizure for fourth amendment purposes. The waiver rule is a limitation on the parties, however, and not on the jurisdiction of the courts. *People v. Shaw*, 186 Ill. 2d 301, 327 (1998). Recognizing both the importance of this issue and our obligation to maintain a sound and consistent body of case law, we choose to address the question in this appeal. See *People v. Williams*, 188 Ill. 2d 293, 301 (1999); *People v. Szabo*, 186 Ill. 2d 19, 23 (1998); *Hux v. Raben*, 38 Ill. 2d 223, 224-25 (1967).

The defendant argues that the detectives' conduct here violated the fourth amendment of the United States Constitution and the search and seizure and privacy clauses of article I, section 6, of the Illinois Constitution. None of these authorities are persuasive, however, and we decline to find that the defendant was subjected to an involuntary seizure.

The defendant cites article I, section 6, of the Illinois Constitution as providing a basis on which to conclude that the action by the police amounted to an involuntary seizure. Article I, section 6, of the Illinois Constitution provides, "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means." Ill. Const. 1970, art. I,

§ 6. The defendant contends that this provision must be interpreted more broadly than its federal constitutional analogue.

The defendant's argument in this regard fails to distinguish between the search and seizure clause and the privacy clause of that provision. Although the specific guarantees of the privacy clause represent a departure from the scope of the United States Constitution (see *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381 (1992)), the separate search and seizure clause does not. Thus, in *People v. Clark*, 65 Ill. 2d 169 (1976), Justice Schaefer explained:

> "It is of course true that section 6 of article I contains references to 'invasions of privacy or interceptions of communications' which are not found in the fourth amendment. The portion of section 6 which deals with unreasonable searches, however, is patterned after the fourth amendment, and the defendant suggests no reason for construing the section as imposing additional conditions which must be met before a search may be deemed a reasonable one." *Clark*, 65 Ill. 2d at 175.

Decisions of this court have long understood the search and seizure clause of article I, section 6, to command an interpretation like the one that is given to the corresponding provision of the fourth amendment. See *Fink v. Ryan*, 174 Ill. 2d 302, 314 (1996); *People v. Mitchell*, 165 Ill. 2d 211, 219 (1995); *People v. Lucente*, 116 Ill. 2d 133, 146 (1987); *People v. Tisler*, 103 Ill. 2d 226, 242 (1984). While the privacy clause of article I, section 6, possesses a unique constitutional history, it is of no assistance here to the defendant, for it is a separate guarantee and does not serve to transform the nearby search and seizure clause into a source of state constitutional rights that are more extensive than those conferred by the fourth amendment.

We note that our decision in *People v. Krueger*, 175 Ill. 2d 60 (1996), is not to the contrary. In *Krueger* the court considered the validity of a "no-knock" statute. In

deciding that the provision was unconstitutional, the court determined that the fourth amendment and article I, section 6, provided similar guarantees. Nonetheless, in holding that the evidence at issue must be suppressed, the court refused to apply the federal good-faith exception to the exclusionary rule, applying instead the Illinois exclusionary rule, which afforded greater protection. We do not construe *Krueger* as suggesting that the search and seizure clause of article I, section 6, of the Illinois Constitution must be interpreted more expansively than the corresponding right found in the fourth amendment. The exclusionary rule is a judicially created remedy, and its history in Illinois may be traced to this court's decision in *People v. Brocamp*, 307 Ill. 448 (1923).

Finally, we do not believe that the defendant was subject to a seizure by law enforcement authorities in this case under the principles applicable to the fourth amendment or the corresponding guarantee found in article I, section 6, of the Illinois Constitution. In *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), the Supreme Court stated:

"We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' [Citation.] As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.
***
We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all

the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 553-54, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

Among the circumstances a court may consider in determining whether a person has been seized for fourth amendment purposes are the presence of multiple police officers, the display of weapons by an officer, the touching of the person by the officers, the officers' use of language suggesting that the person is compelled to obey, and the occurrence of practices that normally accompany an arrest, such as searching, handcuffing, and fingerprinting. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877; see also *People v. Murray*, 137 Ill. 2d 382 (1990).

In the present case, the defendant voluntarily went to the police station with his lawyer. There is no evidence that the detectives there threatened the defendant in any way. Rather than insist that the defendant take part in a lineup, the officers asked counsel whether the defendant would agree to participate in one. The defendant never stated that he did not feel free to leave the premises. The defendant correctly observes that conduct by the police may, in certain circumstances, transform a voluntary appearance into a seizure. Unlike the cases cited by the defendant, however, the present case does not demonstrate that the defendant was effectively seized by the police. *Cf. United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987) (officers separated suspect from coworker, accused suspect of lying, and insisted that he tell the truth); *People v. Young*, 206 Ill. App. 3d 789 (1990) (defendant kept overnight in interview room at police station); *People v. Gordon*, 198 Ill. App. 3d 791 (1990) (defendant kept overnight at police station). In the case at bar, the conduct of the detectives at the police station did not represent a seizure of the defendant. Not until after the lineup concluded was the defendant

formally placed under arrest. Prior to that time, the defendant was not subjected to actions that restricted his freedom to leave. For these reasons, we conclude that the detectives' failure to permit counsel to observe the witness' identification of the defendant in the lineup did not constitute a seizure of the defendant.

### III

Finally, the defendant challenges one of the jury instructions used at his trial, as well as the trial judge's related exclusion of certain evidence. At the State's request, and over defense counsel's objection, the trial judge gave the jury a nonpattern instruction to the effect that a person is not entitled to the assistance of counsel at a lineup conducted prior to the initiation of adversary proceedings. The defendant contends that this instruction was unnecessary and confusing and that it would only have invited the jury to disregard the defense theory regarding the lineup.

The instruction at issue stated:

"A person's right to counsel attaches only after adversary judicial criminal proceedings have been initiated against him, whether by way of a formal charge, preliminary hearing, indictment, information, or arraignment. This is a right not invocable by an accused during the fact finding process, such as a line-up, prior to the commencement of adversarial proceedings."

The defendant contends that the instruction given by the court improperly anticipated that the defense would argue that his constitutional rights were denied. In addition, the defendant complains that the instruction had the improper effect of justifying the detectives' refusal to permit lawyer Ingles into the viewing room and undermined the defendant's argument that Frazier was coached in his identification of the defendant. The defendant further theorizes that the instruction could have led the jurors to believe that he was not entitled to meet with the police with a lawyer, or that he must be guilty

because he chose to do so. Finally, the defendant believes that the instruction implied that the police could not have allowed the defendant's lawyer into the viewing room.

Whether to instruct the jury on a particular matter depends on the facts in the case and the governing law, and the use of a nonpattern instruction is reserved to the trial judge's discretion. *People v. Simms*, 192 Ill. 2d 348, 412 (2000); *People v. Emerson*, 189 Ill. 2d 436, 505 (2000). The defendant concedes that the challenged instruction was "technically accurate"; his objection is directed instead at the possible effect of the instruction on the minds of the jurors. We believe that the defendant misconstrues the likely impact of the instruction on the jury. Throughout the trial, the defendant attacked the reliability of Frazier's identification and repeatedly pointed out that defense counsel had not been allowed in the viewing room during the lineup. The defense thus put at issue the detectives' refusal to permit Ingles into the viewing room, attempting to use that as a means of undermining the reliability of the lineup procedure in this case. We do not believe that the trial judge abused his discretion in giving the jurors the challenged instruction. The instruction simply told the jury that the defendant was not constitutionally entitled to have counsel present during the lineup. This was an accurate statement of the law, as the defendant properly acknowledges, and we believe that it would have helped the jurors in evaluating the defendant's claims regarding the lineup. Under the particular circumstances presented, we do not believe that the trial judge abused his discretion in giving the jurors the nonpattern instruction challenged here.

In a related argument, the defendant maintains that the trial judge's error in giving the preceding instruction was compounded by the judge's earlier refusal to permit

Ingles to testify that in other instances he had been allowed to observe police lineups. The defendant contends that the lawyer's testimony was relevant and demonstrated why counsel accompanied the defendant to the police station.

We have already concluded that no error occurred in the judge's use of the instruction. We also find no merit in the defendant's further contention here that the trial judge erred in excluding Ingles' testimony about other lineups. "Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Patterson*, 192 Ill. 2d 93, 115 (2000). We do not believe that the lawyer's testimony was relevant in this case. What he was allowed to do on previous occasions had no bearing on the conduct of the detectives in this case or their reasons for not permitting counsel to be present during the lineup. Moreover, there was no showing that the lawyer's prior contacts were with the particular detectives involved in this case. On this record, we cannot say that the trial judge abused his discretion in excluding the proffered testimony.

## CONCLUSION

For the reasons stated, the judgment of the appellate court, which affirmed the judgment of the circuit court of Cook County, is affirmed.

*Judgment affirmed.*