No. 2--08--0271    Filed:  2-16-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07--CF--888 |
| KEITH A. GLORIOSO, | ) ) ) | Honorable Fred L. Foreman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BURKE delivered the opinion of the court:

Defendant, Keith A. Glorioso, was charged with unlawful possession of a substance containing cocaine (720 ILCS 570/402(c) (West 2006)).  He moved to suppress evidence seized under a warrant to search his house.  After a hearing, the trial court ruled that the search had violated the "knock and announce" rule, but that, under Hudson v. Michigan, 547 U.S. 586, 165 L. Ed. 2d 56, 126 S. Ct. 2159 (2006), the exclusionary rule did not apply.  After a stipulated bench trial, defendant was convicted and sentenced to 24 months' probation.  On appeal, he contends that, although the evidence cannot be excluded under the fourth amendment to the United States Constitution (U.S. Const., amend. IV), it should be excluded under article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, §6).  We affirm.

On March 13, 2007, shortly before midnight, police officers executed a warrant to search defendant's house in Round Lake Park.  After being charged, defendant moved to suppress the

evidence seized in the search. His motion raised a number of grounds, most of which were rejected and are not pertinent on appeal. We summarize the relevant evidence from the hearing.

Bonnie Palka, defendant's girlfriend, testified that shortly before the police entered defendant's home, she, three young people, and her dog were downstairs. Defendant was upstairs. Palka heard a noise from the deck and looked through a window blind. The police then pounded on the door, kicked it in, and entered the house, with their weapons drawn. The officers knocked Palka down; one officer put a gun to her head and told her not to move. Without provocation and despite her pleas, an officer shot her dog once in the face, then three times in the rear as the dog fled. Eventually, an animal control officer euthanized the dog.

Officer Daniel Kaiser testified that Officer Wayne Wilde knocked on the door and simultaneously announced that the police were present. As Wilde was knocking, Kaiser saw Palka peeking out the window; one officer yelled, "compromise," and another officer immediately used a battering ram to force the door open. Kaiser explained that "[i]f people know we are coming up to the house it is a lot more dangerous once we get to the house," and, further, evidence could be destroyed. However, the police had no information that anyone inside had weapons. Kaiser was the first officer to enter. He saw the dog lunge at him, baring its teeth; Kaiser jabbed at the dog with a rifle, but the dog lunged at him again, so Kaiser shot it three times in rapid succession. The dog ran away. Kaiser denied ever pushing Palka or holding a gun to her head.

Wilde testified that after he knocked on the door, as he was announcing the police presence, another officer yelled "compromise"; Wilde backed away; and an officer used a battering ram to force entry. As Wilde entered, he heard three shots in succession. Entering, Wilde saw blood on the floor and the dog under the kitchen table. Wilde testified that he never pointed a gun at Palka.

Officer Gilberto Rivera, who entered the home immediately after Kaiser, testified consistently with the other officers' accounts of the entry and Kaiser's encounter with the dog.

After arguments, the trial court held that the search violated the fourth amendment's knock-and-announce rule. The court found that the parties' testimony agreed on several crucial facts, e.g., that the police knocked and announced their presence before they entered; that they entered by force immediately after one of them saw Palka looking out the window; and that, by the State's concession, no more than two or three seconds elapsed from the knocking and announcing until the forced entry. The court initially rejected defendant's contention that the police executed the search unreasonably or "outrageously" by shooting and fatally wounding Palka's dog. The court credited the officers' testimony that the dog was a threat to them; therefore, it found that they could legally use force in response (see 725 ILCS 5/108--8(a) (West 2006)).

In holding the search invalid, the court then reasoned as follows. Generally, police officers seeking to enter a dwelling must knock on the door and announce their identity and purpose before attempting to enter by force. See Richards v. Wisconsin, 520 U.S. 385, 387, 137 L. Ed. 2d 615, 620, 117 S. Ct. 1416, 1418 (1997). However, a "no-knock" entry is permissible if the police reasonably suspect that knocking and announcing would be dangerous or futile or would inhibit their investigation, such as by allowing the destruction of evidence. Richards, 520 U.S. at 394, 137 L. Ed. 2d at 624, 117 S. Ct. at 1421. Here, the officers forcibly entered the home no more than three seconds after knocking and announcing their presence. This short wait was unreasonable absent exigent circumstances. See United States v. Banks, 540 U.S. 31, 41, 157 L. Ed. 2d 343, 355, 124 S. Ct. 521, 528 (2003). No such exigency had been shown here. Palka's glance out the window did

not indicate that anyone would have attempted to resist the officers' entry, and the mere possibility of violence or the destruction of evidence created no emergency.

The court then considered whether the illegality required suppressing the evidence seized in the search. Noting that our supreme court has applied the exclusionary rule to violations of the knock-and-announce rule (see People v. Condon, 148 Ill. 2d 96, 108 (1992); People v. Ouellette, 78 Ill. 2d 511, 521-22 (1979)), the court reasoned as follows. In Hudson, the Supreme Court held that the federal exclusionary rule does not apply to violations of the knock-and-announce rule. Therefore, the only issue was whether article I, section 6, of the Illinois Constitution required suppression. With limited exceptions, our supreme court has construed article I, section 6, in "lockstep" with the Supreme Court's construction of the fourth amendment. See People v. Caballes, 221 Ill. 2d 282, 302 (2006). In the only published case considering whether the lockstep doctrine applied to knock-and-announce violations, the Fourth District stated persuasively in dictum that, if confronted with the issue, the supreme court would adopt Hudson and thus refuse to apply the exclusionary rule. People v. Chapman, 379 Ill. App. 3d 317, 325 (2007). Therefore, the court denied the motion to suppress. After he was convicted and sentenced, defendant timely appealed.

On appeal, defendant argues that the trial court erred in refusing to apply the exclusionary rule to the violation of article I, section 6, of the Illinois Constitution. Defendant urges that, under the "limited lockstep approach" (Caballes, 221 Ill. 2d at 313), the supreme court would (and ought to) extend greater remedies under the state constitution for violations of the knock-and-announce rule than has the Supreme Court under the federal constitution. Defendant relies primarily on People v. Krueger, 175 Ill. 2d 60 (1996), which held that a statute authorizing no-knock searches (725 ILCS 5/108--8(b)(2) (West 1994)) was unconstitutional and that article I, section 6, required excluding

evidence that law enforcement officers seized in reliance on the statute. Defendant notes that Krueger deliberately parted ways with the Supreme Court's decision in Illinois v. Krull, 480 U.S. 340, 94 L. Ed. 2d 364, 107 S. Ct. 1160 (1987), which extended the good-faith rule of United States v. Leon, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3430 (1984), to evidence seized under a statute that allowed unconstitutional warrantless administrative searches. Krueger, 175 Ill. 2d at 70-71.

The State responds that we should not depart from lockstep here, because the supreme court has restricted such departures to the unusual situations in which the language of the state constitution or the intent of its framers supports construing article I, section 6, more broadly than the Supreme Court has construed the fourth amendment, the model for article I, section 6. The State maintains that nothing in the history of article I, section 6, or its construction by the supreme court demonstrates such special circumstances. For the reasons that follow, we agree with the State.

Because the issue involved is purely one of law, our review is de novo. See Caballes, 221 Ill. 2d at 289. We start with article I, section 6, itself. It reads:

"The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art I, §6.

The exclusionary rule, of course, does not appear in either the federal fourth amendment or article I, section 6; it is a judicially created remedy for violations of these provisions. Generally, in deciding on the scope of article I, section 6, our supreme court has followed the Supreme Court's

construction of the fourth amendment. However, it has not always been clear or consistent in its approach. For our purposes, Krueger and Caballes are the principal authorities, so we turn to them.

In Krueger, the court had to decide whether to apply the exclusionary rule to evidence that law enforcement officers seized, per warrant, under the authority of a statute that permitted "no-knock" searches in specified circumstances (725 ILCS 5/108--(b)(2) (West 1994)). The trial court held that the search violated the defendant's federal and state constitutional rights. The court declared the statute unconstitutional and excluded the evidence. In doing so, it rejected the State's argument that, under Krull, the evidence should be admitted because the officers relied in good faith on a statute later declared unconstitutional. Krueger, 175 Ill. 2d at 63.

On direct appeal to the supreme court, the State again relied on the good-faith rule announced in Krull. After holding that the statute was unconstitutional, the supreme court then ruled that Krull's "good-faith exception does not comport with article I, section 6." Krueger, 175 Ill. 2d at 70.

Two aspects of the supreme court's rejection of Krull are especially important here. First, although Krueger involved a statute authorizing no-knock searches, the court's disapproval of a good-faith exception to the exclusionary rule centered not on the type of search authorized but on the fact that a statute created that authority. Second, in declining to apply Krull to article I, section 6, the court focused not on the distinctive characteristics of that constitutional guarantee but on perceived infirmities in the reasoning of the "bare majority" that issued Krull. Krueger, 175 Ill. 2d at 70.

The court explained that the Krull majority reasoned that the basic purpose of the exclusionary rule--to deter police misconduct--would not be served by barring the use of evidence that the police had seized in good-faith reliance on a statute that was only later declared

unconstitutional. A "major underpinning" of the Krull opinion was the Court's belief that legislatures are not inclined to act in contravention of fourth amendment values, so that there is no evidence that the exclusionary rule is "necessary to deter legislators from enacting unconstitutional statutes." Krueger, 175 Ill. 2d at 71; see Krull, 480 U.S. at 349-52, 94 L. Ed. 2d at 375-77, 107 S. Ct. at 1166-68. Thus, according to the Court, the slight deterrent effect from applying the exclusionary rule in such situations was outweighed by the substantial social costs of doing so. Krueger, 175 Ill. 2d at 71; see Krull, 480 U.S. at 352-53, 94 L. Ed. 2d at 377, 107 S. Ct. at 1168-69.

The supreme court noted that Krull created two exceptions to its good-faith rule: (1) where, in enacting the statute, the legislature wholly abandoned its responsibility to enact constitutional laws; and (2) where a reasonable officer should have known that the statute was not constitutional. Krueger, 175 Ill. 2d at 71-72; see Krull, 480 U.S. at 355, 94 L. Ed. 2d at 378-79, 107 S. Ct. at 1170.

The Krueger court followed Justice O'Connor's dissent (joined in whole or part by the other three dissenters), which criticized applying Leon's good-faith exception not to the decision of a magistrate issuing a warrant in a particular case but to the act of a legislature passing a statute. This distinction underlay Justice O'Connor's dissent, and thus it also underlay Krueger's rejection of Krull.

First, as the Krueger court noted, Justice O'Connor pointed out that the Krull doctrine provided "a 'grace period' for unconstitutional search and seizure legislation, during which time 'the State is permitted to violate constitutional requirements with impunity.' " Krueger, 175 Ill. 2d at 72, quoting Krull, 480 U.S. at 361, 94 L. Ed. 2d at 382, 107 S. Ct. at 1173 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.). Indeed, in the very case before the Court, in which the statute had been held unconstitutional, no effective remedy could be provided. Krueger, 175 Ill.

2d at 73; see Krull, 480 U.S. at 368, 94 L. Ed. 2d at 387, 107 S. Ct. at 1177 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.).

Second, the Krueger court agreed with Justice O'Connor that history could not support extending the good-faith doctrine to legislative acts. There was a " 'powerful historical basis' " for excluding evidence seized under an unconstitutional statute. Krueger, 175 Ill. 2d at 72, quoting Krull, 480 U.S. at 362, 94 L. Ed. 2d at 383, 107 S. Ct. at 1173 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.). "Statutes authorizing unreasonable searches were the core concern of the Framers of the Fourth Amendment." Krull, 480 U.S. at 362, 94 L. Ed. 2d at 383, 107 S. Ct. at 1173 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.). The Framers did not have a similar fear of judicial officers. Krull, 480 U.S. at 364, 94 L. Ed. 2d at 384, 107 S. Ct. at 1175 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.). Moreover, the exclusionary rule had regularly been applied to suppress evidence gathered under unconstitutional statutes. Krull, 480 U.S. at 364, 94 L. Ed. 2d at 384, 107 S. Ct. at 1174 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.).

Third, the court agreed with Justice O'Connor that the historical distinction between judicial officers and legislatures is compelling. The former act one case at a time, but a statute " 'sweeps broadly, authorizing whole classes of searches, without any particularized showing,' " thus affecting far more people and " 'pos[ing] a greater threat to liberty.' " Krueger, 175 Ill. 2d at 73, quoting Krull, 480 U.S. at 365, 94 L. Ed. 2d at 385, 107 S. Ct. at 1175 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.).

The supreme court acknowledged that it had "long applied the lockstep doctrine to follow Supreme Court decisions in fourth amendment cases." Krueger, 175 Ill. 2d at 74. However, because

the court had also long applied the exclusionary rule to evidence gathered under unconstitutional statutes, following Krull "would drastically change this state's constitutional law." Krueger, 175 Ill. 2d at 75. Whether to do so depended on the application of the traditional test of " 'balanc[ing] the legitimate aims of law enforcement against the right of our citizens to be free from unreasonable government intrusion.' " Krueger, 175 Ill. 2d at 75, quoting People v. Tisler, 103 Ill. 2d 226, 245 (1984). Krull failed this balancing test, because it would give the legislature a "grace period" for violating constitutional rights, and that period "could last for several years and affect large numbers of people." Krueger, 175 Ill. 2d at 75.

Although Krueger noted that adopting Krull's construction of the exclusionary rule would depart from long-standing state judicial constructions of the exclusionary rule, it did not rely on anything distinctive in the language or drafting of article I, section 6, itself. However, that possible reason for departing from lockstep was discussed in Caballes. There, the Supreme Court had previously vacated a supreme court opinion and held that a routine canine sniff of a vehicle during a traffic stop did not violate the fourth amendment. Illinois v. Caballes, 543 U.S. 405, 408-10, 160 L. Ed. 2d 842, 847-48, 125 S. Ct. 834, 837-38 (2005), vacating and remanding People v. Caballes, 207 Ill. 2d 504 (2003). On remand, the supreme court was faced with whether to construe article I, section 6, similarly. In the course of a lengthy history of the lockstep doctrine, the court reiterated its statement in Tisler, 103 Ill. 2d at 243, that, because it had for so long generally interpreted article I, section 6, in conformity with the Supreme Court's construction of the fourth amendment, the burden was on those who urged deviating from such conformity. Thus, to construe article I, section 6, more expansively than the Supreme Court construed the fourth amendment:

" 'We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned.' " Caballes, 221 Ill. 2d at 297, quoting Tisler, 103 Ill. 2d at 245.

According to the court, Krueger "appeared to depart from the lockstep approach" (Caballes, 221 Ill. 2d at 302) without finding anything in the intent of article I, section 6, in support (Caballes, 221 Ill. 2d at 303). However, the court reasoned, Krueger simply had nothing to do with the lockstep doctrine. The court cited People v. Bolden, 197 Ill. 2d 166, 179-80 (2001), in which it had refused to " 'construe Krueger as suggesting that the search and seizure clause of article I, section 6, of the Illinois Constitution must be interpreted more expansively than the corresponding right found in the fourth amendment. The exclusionary rule is a judicially created remedy *** [citation].' " Caballes, 221 Ill. 2d at 303. Thus, according to Caballes, "in Krueger, we did not depart from lockstep interpretation--the challenged statute was unconstitutional under both the state and federal constitutions. Krueger was a case about remedies." Caballes, 221 Ill. 2d at 303.

At this point, we must note a serious difficulty with both the soundness and the continued vitality of the court's statement that Krueger did not depart from lockstep. In Krueger, the court prefaced its explanation of its decision with the following language:

"This court unquestionably has the authority to interpret provisions of our state constitution more broadly than the United States Supreme Court interprets similar provisions of the federal constitution. [Citation.] We acknowledge that this court has long applied the lockstep doctrine to follow Supreme Court decisions in fourth amendment cases. [Citations.]

We knowingly depart from that tradition here, for the reasons set forth below." (Emphases added.) Krueger, 175 Ill. 2d at 74.

Neither Caballes nor Bolden explains why, if Krueger did not depart from the lockstep doctrine, the Krueger court explicitly acknowledged that it was doing just that. We cannot be sure whether the Caballes and Bolden courts simply overlooked the plain language that we have just quoted or whether they intended to overrule it by implication. The difference is highly consequential. If the court simply misread Krueger, then we may assume that it did not choose to take exclusionary-rule issues out of the general lockstep doctrine; in this event, a party urging an extension of the state exclusionary rule beyond the limits of the federal one would bear the burden of showing cause for such an extraordinary deviation from long-standing practice. If, however, the court did mean to overrule Krueger's statement that exclusionary-rule jurisprudence is subject to the lockstep doctrine, then the state exclusionary rule becomes much more amenable to judicial expansion. Decoupling exclusionary-rule doctrine from lockstep considerations would remove the constraint that the latter places on the former.

The first possibility appears to us to be the more likely of the two. After Krueger, although before Bolden, the court stated, "Our only recent departure from a lockstep construction of our search and seizure provision was in People v. Krueger." People v. Cox, 202 Ill. 2d 462, 482 (2002), overruled on other grounds by People v. Bew, 228 Ill. 2d 122, 130-31 (2008). In People v. Lampitok, 207 Ill. 2d 231, 240-41 (2003), the court described Krueger's holding as "[t]he narrow exception we have carved to the lockstep doctrine in the fourth amendment context." Therefore, even if the court in Bolden intended to overrule Krueger's holding that the state exclusionary rule is subject to the lockstep doctrine, the court appears to have repudiated that intent later.

More striking (and more important), in Caballes itself, after the passage that stated that Krueger had nothing to do with lockstep at all, the court twice treated Krueger as indeed having been a lockstep case. First, in explaining the various criteria that it had applied over the years to decide whether to depart from lockstep, the court observed that Krueger implicitly adopted criteria beyond those listed in Tisler. Caballes, 221 Ill. 2d at 310. Second, the court described its "limited lockstep approach in Tisler" as having been "modified" in Krueger (and in People v. Washington, 171 Ill. 2d 475 (1996), applying state due process to make freestanding claims of actual innocence cognizable in state postconviction proceedings, in contrast to federal habeas corpus suits). Caballes, 221 Ill. 2d at 301, 314. Thus, Caballes itself is hardly consistent on the question of whether the lockstep doctrine has any bearing on the construction of the state exclusionary rule.

We thus decline to read Caballes and Bolden as taking the state exclusionary rule out of the constraints of the lockstep doctrine. Krueger unambiguously stated that, to construe the state exclusionary rule more broadly than the federal rule, a court must find strong reasons to depart from the long-standing tradition of construing the former in conformity with the latter. Bolden stated otherwise, and Caballes adopted both positions without explaining the discrepancy. Therefore, we shall proceed on the premise that, to decide whether article I, section 6, requires suppressing evidence seized in violation of the knock-and-announce rule, we must first ask whether there are sufficient grounds to "suddenly change course and go our separate way" (Tisler, 103 Ill. 2d at 245) by refusing to follow Hudson.

To answer this question, we need to know what circumstances support deviating from lockstep. That requires resuming our discussion of Caballes. After providing further historical background (not important here), the court summarized its long-standing practice as a "limited

lockstep approach." <u>Caballes</u>, 221 Ill. 2d at 309. This approach requires assessing the intent of the framers of the Illinois Constitution of 1970. <u>Caballes</u>, 221 Ill. 2d at 313. The court continued:

"[B]ased on its understanding of the intent of the drafters, this court adopted a limited lockstep approach in <u>Tisler</u> and modified it in <u>Krueger</u> and <u>Washington</u> to allow consideration of state tradition and values as reflected by long-standing state case precedent. *** [This approach] is based on the premise that the drafters of the 1970 constitution and the delegates to the constitutional convention intended the phrase 'search and seizure' in the state document to mean, in general, what the same phrase means in the federal constitution." <u>Caballes</u>, 221 Ill. 2d at 314.

This passage speaks of the interpretation of the phraseology of article I, section 6, not the construction of a judicially created remedy that does not appear there (or elsewhere in the Illinois Constitution). That is not altogether surprising, as the issue in <u>Caballes</u> was the meaning of the phrase "search and seizure" and not the scope of the exclusionary rule. Nonetheless, reading <u>Caballes</u> as a whole, we believe that, in a given case, the court will not expand the state exclusionary remedy beyond the federal one, unless the proponent of the expansion can show either that (1) the framers of the 1970 constitution intended the expansion; or that (2) denying the expansion would be antithetical to "state tradition and values as reflected by long-standing case precedent" (<u>Caballes</u>, 221 Ill. 2d at 314). We turn to whether defendant has made such a showing in this case.

In <u>Hudson</u>, the Supreme Court held, by a five to four vote, that the federal exclusionary rule does not apply to violations of the knock-and-announce requirement. Justice Scalia's opinion for the majority reasoned that the no-knock rule protected interests separate from those protected by the warrant requirement and that the deterrence value of excluding evidence that was seized only after

a facially valid warrant was issued was outweighed by the high social costs of doing so. The interests protected by the no-knock rule include (1) avoiding violence in supposed self-defense by the surprised occupant; (2) allowing people to comply and avoid the destruction of property occasioned by a forcible entry; and (3) protecting those elements of privacy and dignity that can be destroyed by a sudden entrance. Hudson, 547 U.S. at 594, 165 L. Ed. 2d at 66, 126 S. Ct. at 2165. However, the knock-and-announce rule has never protected a person's interest in preventing the government from seeing or taking evidence described in a warrant; the interests violated by the way in which a proper warrant is executed have nothing to do with the seizure of the evidence. Hudson, 547 U.S. at 594, 165 L. Ed. 2d at 66, 126 S. Ct. at 2165.

The Court identified what it saw as the high costs of applying the exclusionary rule to knock-and-announce violations. These included (1) the difficulty and potential arbitrariness of applying the nebulous requirement of a reasonable waiting time and (2) the danger that, in erring on the side of caution, officers might wait longer than the law requires before entering, leading to preventable violence or the destruction of evidence. Hudson, 547 U.S. at 595-96, 165 L. Ed. 2d at 66-67, 126 S. Ct. at 2165-66. Against these costs, the Court saw limited deterrence benefits. First, the Court reasoned, although violating the warrant requirement sometimes produces incriminating evidence that could not otherwise be obtained, violating the knock-and-announce rule does nothing other than prevent either the destruction of evidence or dangerous resistance by occupants--and even a reasonable suspicion of these dangers is sufficient to suspend the knock-and-announce requirement anyway. Second, deterrence does not require applying the exclusionary rule, as both civil-rights suits and the increasing professionalism of police forces already provide such deterrence. Hudson, 547 U.S. at 596-99, 165 L. Ed. 2d at 67-69, 126 S. Ct. at 2166-68.

In dissent, Justice Breyer maintained that the majority was mistaken in both its characterization of the interests protected by the knock-and-announce rule and its deterrence analysis. According to Justice Breyer, the distinction between the rule and the warrant requirement does not hold up: both are highly relevant to the ultimate question of the reasonableness of a search, and both are "part of the 'centuries-old principle' of special protection for the privacy of the home." Hudson, 547 U.S. at 621, 165 L. Ed. 2d at 83, 126 S. Ct. at 2181 (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.), quoting Georgia v. Randolph, 547 U.S. 103, 115, 164 L. Ed. 2d 208, 222, 126 S. Ct. 1515, 1523 (2006). Furthermore, he reasoned, the social costs that the majority associated with suppressing evidence because of a knock-and-announce violation are simply "those that typically accompany any use of the Fourth Amendment's exclusionary principle." (Emphasis in original.) Hudson, 547 U.S. at 614, 165 L. Ed. 2d at 79, 126 S. Ct. at 2177 (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.). As for deterrence, Justice Breyer pointed to the lack of evidence that civil-rights suits are effective against knock-and-announce violations. Hudson, 547 U.S. at 609-11, 165 L. Ed. 2d at 76-77, 126 S. Ct. at 2174-75 (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.). Thus, Justice Breyer would not add knock-and-announce violations to the narrow class of fourth amendment violations to which the exclusionary rule does not apply. Hudson, 547 U.S. at 611-12, 165 L. Ed. 2d at 77-78, 126 S. Ct. at 2175-76 (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.).

Only one Illinois opinion has considered the impact of Hudson on the construction of article I, section 6. In Chapman, the court upheld the trial court's conclusion that the police complied with the knock-and-announce rule when they searched the defendant's home. Chapman, 379 Ill. App. 3d at 325. The court then stated in dictum that, given Caballes's reaffirmation of the limited-lockstep

doctrine, "we believe the Supreme Court of Illinois would likely adhere to Hudson." Chapman, 379 Ill. App. 3d at 325. The court did not further explain its guarded prediction.

Although Chapman's dictum is not especially helpful, we do agree with its conclusion that the supreme court would not consider Hudson one of the rare instances in which to break out of lockstep. As noted, the advocate of such a break must show that it is warranted by either (1) the intent of the framers of article I, section 6, or (2) "state tradition and values as reflected by long-standing state case precedent." Caballes, 221 Ill. 2d at 314. We do not believe that defendant has made either showing.

The intent of the constitution's framers may be shown either by the language that they used or by the debates and committee reports of the constitutional convention. Caballes, 221 Ill. 2d at 297; Tisler, 103 Ill. 2d at 245. Here, because the state exclusionary rule is a judicially created remedy, as is the federal rule, the language of article I, section 6, does not really show anything. Defendant has provided us with the debates on the adoption of article I, section 6. Notably, although there was much discussion of the proposed language that was not borrowed from the fourth amendment--that concerned with "unreasonable *** invasions of privacy or interceptions of communications by eavesdropping devices or other means" (Ill. Const. 1970, art. I, §6)--there was no discussion of the exclusionary rule itself. Specifically, no delegate expressed concern over whether, when evidence is seized in violation of both the fourth amendment and article I, section 6, the state remedy should be greater than the federal remedy. (This, of course, explains why the Krueger court did not cite the framers' intent in deciding that the state exclusionary rule should apply to evidence seized under a statute that authorizes unconstitutional searches.) Thus, defendant has not satisfied the first prong of the Caballes inquiry--indeed, he has come up empty.

We turn to the second prong--long-standing state constitutional law. Here, we find little to suggest that the supreme court would conclude (or that we ought to conclude) that adopting Hudson would violate established precedent. Although the supreme court applied the exclusionary rule to knock-and-announce violations in Ouellette and Condon, the court in each case assumed, without any discussion, that the exclusionary rule applied under both the federal and the state constitutions. See Condon, 148 Ill. 2d at 108; Ouellette, 78 Ill. 2d at 521-22. While such an unspoken assumption was entirely reasonable under the circumstances, it is hardly the stuff of which "state tradition and values" (Caballes, 221 Ill. 2d at 314) are made. Moreover, because the Condon and Ouellete courts did not have to decide whether to deviate from fourth amendment precedent in construing article I, section 6, their opinions say nothing about what they would have done had the Supreme Court previously decided that the federal exclusionary rule did not apply to knock-and-announce violations. Thus, to decide whether anything in our case law now requires excluding evidence seized in violation of the knock-and-announce rule, we must look elsewhere. But when we do, we find little.

Apparently, the only time that the supreme court has deviated from lockstep in its construction of the state exclusionary rule is Krueger. As we have noted, although that case did involve an unconstitutional no-knock search, the type of the search was not pertinent to the court's decision. Rather, that decision was based on the distinction between the actions of a magistrate issuing a warrant in an individual case and a statute that has the potential to violate the constitutional rights of many people without any redress. This distinction militates against departing from lockstep for knock-and-announce violations. Although these infringements of constitutional rights are committed by police officers rather than magistrates, either type " 'affects one person at a time,' " in contrast to legislation authorizing unconstitutional searches, which " 'may affect thousands or

millions and will almost always affect more than one.' " Krueger, 175 Ill. 2d at 73, quoting Krull, 480 U.S. at 365, 94 L. Ed. 2d at 385, 107 S. Ct. at 1175 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.). Moreover, whatever one makes of the debate in Hudson over the effectiveness of civil suits as relief against violations of the knock-and-announce rule, there is no doubt that such relief is available. By contrast, as Krueger stressed, no relief is available against a legislature that has authorized unconstitutional searches and seizures. See Krueger, 175 Ill. 2d at 75.

In a later opinion declining to deviate from its application of Leon to article I, section 6, the supreme court emphasized the distinction between legislation authorizing unconstitutional searches and nonlegislative actors authorizing or executing unconstitutional searches. The court held that evidence seized in good faith via anticipatory search warrants that were unauthorized by statute, but not unconstitutional, should not be suppressed on that ground. The court distinguished Krueger as having involved a statute that affirmatively authorized an entire class of unconstitutional searches, thus triggering the court's long-standing aversion to exposing large numbers of people to constitutional violations without any recourse. People v. Carlson, 185 Ill. 2d 546, 557-59 (1999).

The supreme court has been unwilling to extend Krueger beyond legislation, and we see nothing in Krueger that would allow us to extend that opinion to police officers' violation of the knock-and-announce rule. Therefore, the "narrow exception [that Krueger] carved to the lockstep doctrine in the fourth amendment context" (Lampitok, 207 Ill. 2d at 240-41) does not support carving out another exception under the very different circumstances presented here.

Because we conclude that the trial court properly applied Hudson to defendant's state constitutional argument, we hold that the court did not err in refusing to suppress the evidence seized in the search of defendant's home. Therefore, the trial court's judgment must stand.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

HUTCHINSON, J., concurs.

JUSTICE McLAREN, specially concurring:

I agree with Justice Breyer's dissenting opinion in <u>Hudson</u>. However, we are constrained to follow the majority's holding in <u>Hudson</u> regarding the ambit of the fourth amendment. Therefore, I concur in this majority's analysis of the holding in <u>Hudson</u> and the manner in which the Illinois Supreme Court would resolve this issue on appeal.